**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In re: Motion to Compel Compliance with Subpoena Directed to Information Technology Management Services Inc.** | **Misc. Action No. _____** |
| _____ | |
| ***Underlying Case*** | |
| **Plus One, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 23-cv-2016 (KMM/JFD)** **(U.S.D.C. D. Minn.)** |
| **Capital Relocation Services LLC,** | |
| **Defendant.** | |

**DECLARATION OF JONATHON A. TALCOTT**
**IN SUPPORT OF MOTION TO COMPEL COMPLIANCE**
**WITH SUBPOENA DIRECTED TO NONPARTY INFORMATION TECHNOLOGY**
**MANAGEMENT SERVICES INC. AND FOR CONTEMPT SANCTIONS**

I, Jonathon A. Talcott, declare the following:

1.      I am an attorney and partner at the law firm of Ballard Spahr LLP, representing Plaintiff Plus One, LLC in the underlying civil action, which is proceeding in the United States District Court for the District of Minnesota. I am over the age of twenty-one, am competent to testify, and the following is based on my personal knowledge.

2.      Attached as **Exhibit 1** is a true and correct copy of a subpoena issued by me in this matter to nonparty Information Technology Services Inc. The subpoena includes a tailored set of requests for documents, things, and electronically stored information that go to highly relevant issues in the underlying civil action. The subpoena was intended to avoid imposing any undue burden on Information Technology Services Inc.

3.      Attached as **Exhibit 2** is a true and correct copy of the proof of service of the foregoing subpoena upon Hoan Le, on behalf of Information Technology Services Inc.

4.      Attached as **Exhibit 3** is a true and correct copy of the First Amended Complaint in this matter.

5.      Attached as **Exhibit 4** is a true and correct copy of the most recent annual report for Information Technology Management Services Inc. as retrieved from the Secretary of State for the Commonwealth of Virginia.

6.      Attached as **Exhibit 5** is a true and correct copy of a printout from the "Locations" page of the website of Information Technology Management Services Inc.

7.      Attached as **Exhibit 6** is a true and correct copy of an email chain between me and Hoan Le.

8.      Attached as **Exhibit 7** is a true and correct copy of the most recently entered, operative Amended Pretrial Scheduling Order in the underlying action.

9.      As shown in Exhibit 6, I was contacted by e-mail on the morning of September 19, 2024, by Hoan Le, President of Information Technology Management Services Inc., who sought an extension of time until October 11, 2024, to respond to the subpoena and otherwise indicated his intentions to fully comply with the subpoena. I responded a few hours thereafter, agreeing to the requested extension.

10.      Since that time, I have not heard anything further from Hoan Le or from anyone else on behalf of Information Technology Management Services Inc., which has never made any production or served any objections to the subpoena.

11.     I sent follow-up e-mails to Mr. Le on October 14, 2024, and on October 25, 2024, to which I received no response.

12.     In addition to my e-mail communications, in the afternoon on on November 5, 2024, I called the phone number provided by Hoan Le twice. When the second call was not answered, I left a voice message stating, in substance, I would allow him a final chance to communicate about the subpoena, but if we did not hear back from him by end of the following day (November 6, 2024), Plus One, LLC would have no choice but to file a motion to compel and to seek sanctions. To date, I have received no response.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 7, 2024.                    /s/ Jonathon A. Talcott

                                                 _____
                                                 Jonathon A. Talcott

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Minnesota

**EXHIBIT 1**

Plus One, LLC )
_____ )
*Plaintiff* )
v. ) Civil Action No. 0:23-cv-02016-KMM-JFD
Capital Relocation Services L.L.C., )
)
_____ )
*Defendant* )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Information Technology Management Services Inc. c/o Hoan Le
12019 English Maple Ln, Fairfax, VA 22030; (703) 625-1535
*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A.

| Place: Ballard Spahr LLP, 1909 K Street, NW, 12th Floor, Washington, DC 20006-1157, or via e-mail/secure electronic transfer to talcottj@ballardspahr.com | Date and Time: 09/19/2024 12:00 pm |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/29/2024

*CLERK OF COURT*

OR

_____          /s/Jonathon A. Talcott
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiff
Plus One LLC , who issues or requests this subpoena, are:
Ballard Spahr LLP, 200 IDS Center, 80 S. 8th Street, Minneapolis, MN 55402, talcottj@ballardspahr.com, 612-371-3211

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  0:23-cv-02016-KMM-JFD

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

## SUBPOENA TO
## INFORMATION TECHNOLOGY MANAGEMENT SERVICES INC.

### I.    Instructions

1.    This Subpoena requires you to produce the documents and things enumerated below if they are in your possession or custody, or if they are in anyone else's possession or custody and you have the legal right or practical ability to obtain them on demand (for example, anything held by your affiliates, attorneys, accountants, consultants, receivers, directors, officers, members, employees, or agents, or anything held by any other person who has a legal or contractual obligation to turn over the requested materials to you upon your request).

2.    The Court in this case has entered a protective order that allows you to designate certain information as confidential. The protective order also specifies your obligations related to any claims of attorney-client privilege you make, and the requirements under the order may not be the same as, and to the extent different they supersede, the requirements of Rule 45(e)(2) of the Federal Rules of Civil Procedure. A copy of the applicable Amended Protective Order is attached as Exhibit B to this Subpoena.

3.    Pursuant to Rule 45(e)(1)(B) of the Federal Rules of Civil Procedure, you must produce all electronically stored information responsive to this Subpoena with the original metadata intact, and in the formats specified in Exhibit C to this Subpoena.

### II.    Definitions

1.    "Plus" and "Plaintiff" mean Plus One, LLC, Plus Relocation, LLC, and each of their parents, subsidiaries, divisions, affiliates (foreign and domestic), predecessors, and successors, and each of their past and present officers, directors, employees, agents, shareholders, representatives, attorneys, and advisors.

2.    "You," "Your," and "ITMS" mean Information Technology Management Services Inc., and each of its past or present parents, subsidiaries, divisions, affiliates (foreign and domestic), predecessors, and successors, and subcontractors (including but not limited to Savvycom Software and CMC Global Ltd.), and all of its present and former officers, directors, employees, agents, shareholders, representatives, attorneys, and advisors.

3.    "CapRelo" and "Defendant" mean Capital Relocation Services L.L.C., JK Moving Services, JK Global Staffing Services, LLC, and JK Moving & Storage, Inc., and all of their parents, subsidiaries, divisions, affiliates (foreign and domestic), predecessors, and successors, and all of their present and former officers, directors, employees, agents,

shareholders, representatives, attorneys, and advisors, including but not limited to Ciresi Conlin.

4.　"JK Moving" means JK Moving Services, JK Global Staffing Services, LLC, and JK Moving & Storage, Inc., and all of their parents, subsidiaries, divisions, affiliates (foreign and domestic), predecessors, and successors, and all of their present and former officers, directors, employees, agents, shareholders, representatives, attorneys, and advisors.

5.　"1Rivet" means 1Rivet U.S. Inc., 1Rivet Global Inc., 1Rivet International Inc., 1Rivet Worldwide, Inc., and 1Rivet LLC, and each of their past or present parents, subsidiaries, divisions, affiliates (foreign and domestic), predecessors, and successors, and all of their present and former officers, directors, employees, agents, shareholders, representatives, attorneys, and advisors.

6.　"Lawsuit" means the lawsuit styled *Plus One, LLC v. Capital Relocation Services L.L.C.*, No. 23-cv-2016 (KMM/JFD) that is currently pending in the United States District Court for the District of Minnesota.

7.　"Document(s)" means a record of any kind, whether on paper, in electronic form, or in any other form.

8.　"Communication(s)" means　every manner or method of disclosing, transferring, transmitting, or exchanging information, whether in writing, electronically or on paper, and whether by, *e.g.*, mail, facsimile, email, internet communication, text message, iMessage, Skype, Microsoft Teams, Slack, social media (*e.g.*, Facebook, LinkedIn, Instagram), face-to-face, voice recordings, telephone or otherwise.

9.　"Referring," "relating," or "concerning" (and all variations of those words) shall be construed in their most inclusive sense, and shall mean reflecting, pertaining to, consisting of, mentioning, or in any way logically or factually connecting with the matter discussed. A document "referring to" or "relating to" a given subject includes any document that reflects, constitutes, contains, embodies, pertains to, mentions, consists of, comprises, shows, comments on, evidences, describes, or in any other way references that subject.

10.　"Core-Flex Program" means a relocation tool that offers "core" benefits (e.g., household goods, temporary lodging, and moving services) and "flex" benefits (e.g., gift cards, cleaning services, rideshare services, etc.) for relocating employees or for employers. Core-Flex Program includes, but is not limited to, CompanionFlex.

11.　"Point C" means Plus's employee relocation benefits selection tool.

12.　"CompanionFlex" means CapRelo's relocation benefits selection tool, including all versions of current and predecessor tools, including the administrative and

2

reporting site(s), and any related, integrated, or co-developed tools, APIs, operating system, or other software, including, but not limited to, ServiceEngine.

13.    "Companion" means CapRelo's relocation management system, including all versions of current and predecessor programs, and any related, integrated, or co-developed programs, APIs, operating system, or other software, including, but not limited to, ServiceEngine.

14.    "Features" refers to any functionality of software, including, but not limited to, end-user functionalities, administrative functionalities, and/or technical functionalities.

15.    "Development" refers to anything related to any aspect of the development of a software product, including but not limited to its conception, requirements gathering and documentation, design, coding, testing, gathering or implementation of feedback, or releasing of any software product.

16.    "Walmart" means Walmart Inc. and all of its past or present parents, subsidiaries, divisions, affiliates (foreign and domestic), predecessors, and successors, and each of their present and former officers, directors, employees, agents, shareholders, representatives, attorneys, and advisors, including but not limited to the Walmart Global Mobility team.

## III.    Documents and Things Demanded

**REQUEST NO. 1**: All documents and communications mentioning, relating to, or referencing the Master Services Agreement entered into as of November 25, 2022 between ITMS and JK Moving Services and any Statements of Work or other agreements or amendments thereto or thereunder (collectively, "the MSA") and any negotiations or communications preceding or leading up to the MSA, including, without limitation all agreements between ITMS and its subcontractors (i.e., CMC Global Ltd and Savvycom Software) mentioning, relating to, or referencing the same.

**REQUEST NO. 2**: All documents and communications mentioning, discussing, relating to, or referencing any deliverables or other work performed in connection with the MSA, including all weekly status reports, PowerPoint presentations, full screen designs, business requirements documents, technology architecture, and estimates or plans for implementation, and any feedback from JK Moving and/or CapRelo related thereto.

**REQUEST NO. 3**: All documents and communications relating to the creation, design, build or development of any employee benefit software, including but not limited to any Core-Flex Program for JK Moving and/or CapRelo, including the Core-Flex Program referenced in the MSA or any related Business Requirements Documents, including documents and communications relating to the features, screen design, service card design, page navigation, timeline tracking, pricing details, functionality, or code architecture of the

3

Core-Flex Program, its integration into or interrelationship with Companion, its similarity to Plus's Point C program, any predecessor Core-Flex Program created, designed, built or developed by 1Rivet, and any anticipated, estimated and/or set timelines or deadlines imposed by CapRelo and/or JK Moving.

**REQUEST NO. 4**: All documents and communications relating to Plus or Point C, including but not limited to all documents and communications relating to any live demos of Point C, the features, screen design, service card design, page navigation, timeline tracking, pricing details, functionality, or code architecture of Point C, its integration for Walmart, and JK Moving and/or CapRelo's desire to replicate Point C or any Point C features or functionality or architecture in the Core-Flex Program.

**REQUEST NO. 5**: All documents and communications relating to Companion, CompanionFlex, and any predecessors or components thereof including but not limited to source code, technical specifications, technical requirements, software description, user guides, code release logs, version releases, updates and/or any code repository and documentation relating to any Core-Flex Program created, designed, built or developed by 1Rivet.

**REQUEST NO. 6**: All documents and communications regarding ITMS's, JK Moving's and/or CapRelo's review or consideration of any other relocation benefits software in connection with the development of the Core-Flex Program.

**REQUEST NO. 7**: All documents and communications relating or reflecting the amount of time spent by You and the costs, expenditures, or charges, fees, and revenues associated therewith in connection with the MSA or in connection with the creation, design, build or development of any Core-Flex Program for CapRelo and/or JK Moving, including but not limited to timesheets, time cards, invoices, and payment receipts.

**REQUEST NO. 8**: All documents and communications mentioning, relating to, or referencing the existence of any non-disclosure or confidentiality agreement between CapRelo and/or JK Moving and Plus, including the Non-Disclosure Agreement entered into as of March 31, 2021 between Plus and CapRelo ("the NDA"), or otherwise referencing any obligation of CapRelo and/or JK Moving to refrain from disclosing or using any confidential or trade secret information of Plus.

**REQUEST NO. 9**: An operable copy of, including credentials to allow access to all user and administrator account types for, each version of any software You contributed to or participated in designing, building, or developing for JK Moving and/or CapRelo or received by You from 1Rivet, JK Moving and/or CapRelo, including, but not limited to, access and credentials for all user and administrator, RMC, and/or other back-end user access as it would exist in an operable or otherwise working manner as it existed for each user type of the Core-Flex Program.

**REQUEST NO. 10**: For each version of software produced in response to Request No. 9, the source code underlying each version, and including all technical, design, and development documentation (including, e.g., source code, database designs, requirements documents, Jira tickets, Git commit data) for each version of or revision to the Core-Flex Program, any API or API components for or used with any of the foregoing, at any stage of development and whether released or not, from November 2020 to the present.

**REQUEST NO. 11**: Any and all documents and communications relating to, mentioning, or describing the document retention policies employed and/or implemented by ITMS, and/or any other third parties engaged directly or indirectly by ITMS, relating to the creation, design, build or development of the Core-Flex Program for JK Moving and/or CapRelo and any related communications with JK Moving and/or ITMS.

<u>EXHIBIT B</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Plus One, LLC,

                   Plaintiff,

   v.

Capital Relocation Services L.L.C.,

                   Defendant.

Case No. 23-cv-2016 (KMM/JFD)

**AMENDED PROTECTIVE ORDER**

---

      Pursuant to Fed. R. Civ. P. 26(c), and upon the stipulation of Plaintiff and Defendant (Dkt. No. 121), the Court recognizes that documents that will be sought through discovery in the above-captioned action that may contain trade secret or other confidential information as is contemplated by Fed. R. Civ. P. 26(c)(1)(G). The parties have agreed to be bound by the terms of this Amended Protective Order ("Order") in this action to facilitate discovery and to protect the respective interests of the parties in their trade secrets and/or confidential information. This Order shall remain in effect unless modified pursuant to the terms contained in this Order.

      **IT IS HEREBY ORDERED THAT:**

1.    **Definitions**. As used in this Order:

    (a)      The term "**Counsel**" will mean outside counsel of record in this lawsuit, and other attorneys, paralegals, secretaries, and other support staff employed by outside counsel of record.

(b)     The term "**document**" will mean information disclosed or produced in discovery, including at a deposition.

(c)     The term "**Designated Party Representative**" will mean an individual who is employed by a party and is either responsible for litigation decision-making in the above-captioned proceeding or with whom a party's Counsel, in its sole discretion, deems it necessary to consult with regarding Designated Materials in connection with this action.

(d)     The term "**Designated Material**" will mean documents containing Confidential Information that are designated by any party as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," in accordance with paragraph 2 below.

(e)     To "**destroy**" or "**purge**" electronically stored information will mean to delete from all databases, applications, and file systems so that the information is not accessible without the use of specialized tools or techniques typically used by a forensic expert.

(f)     The term "**notice**" or "**notify**" will mean written notice.

(g)     The term "**party**" means a party to this action.

(h)     The term "**Protected Document**" will mean a document subject to attorney-client privilege or the attorney work-product doctrine.

2.      **Designating a Document as Confidential or Highly Confidential.**

(a)     A party or non-party disclosing or producing a document may designate it as "CONFIDENTIAL" if the party or non-party contends that it contains confidential information. "Confidential Information" will mean information that has not been made

2

public by the designating party and that the designating party or non-party reasonably and in good faith believes contains or comprises: (i) material that is confidential pursuant to applicable law, including trade secrets, and any other materials that the designating party believes in good faith to be entitled to protection under Fed. R. Civ. P. 26(c)(1)(G); (ii) proprietary or otherwise sensitive non-public business information; or (iii) information implicating an individual's legitimate expectation of privacy, such as personal financial information or personal identifying information of the type described in Fed. R. Civ. P. 5.2. The designating party or non-party shall, when producing materials and when filing material with the Court in this action, make a good faith assessment of whether the passage of time has eliminated the need to designate the material as "confidential."

(b)     A party or non-party may designate a document as confidential by conspicuously marking each page with the word "CONFIDENTIAL" or as otherwise provided in any stipulation between the parties establishing a protocol for the discovery of electronically stored information.

(c)     A party or non-party may supplement the "CONFIDENTIAL" mark with the words "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," when a document contains Confidential Information and the designating party or nonparty reasonably and in good faith believes the document is so highly sensitive and is of such a nature that disclosure would create a substantial risk of economic injury. The designating party or nonparty shall, when producing materials and when filing material with the Court in this action, make a good faith assessment of whether the passage of time has eliminated

3

the need to mark the material as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

(d)      Deposition testimony may be designated as CONFIDENTIAL, or HIGHLY CONFIDENTIAL:

      i.      on the record at the deposition; or

      ii.     after the deposition, by notifying the parties and those who were present within ten (10) days of receipt of the deposition transcript to inform them of the portions of the transcript to be designated as confidential or highly confidential.

(e)      If a witness is expected to testify as to confidential or highly confidential information, a party or non-party may request that the witness's deposition be taken in the presence of only those persons entitled to receive or access such confidential or highly confidential information.

(f)      The originals of the deposition transcripts and all copies of the deposition must bear the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," as appropriate, and the original or any copy ultimately presented to a court for filing must not be filed unless it can be accomplished under seal, identified as being subject to this Order, and protected from being opened except by order of this Court.

(g)      In the event a producing party elects to make documents available for inspection, no marking need be made by the producing party in advance of the initial inspection. For purposes of the initial inspection, all documents produced will be treated

as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and must be treated as such pursuant to the terms of this Order. Upon selection of specified documents for copying by the inspecting party, the producing party must, within a reasonable time prior to producing those documents to the inspecting party, stamp the copies of those documents that contain confidential or highly confidential information with the appropriate confidentiality marking.

**3.      Who may receive Designated Materials.**

(a)      Designated Materials may be used only in connection with this action and in accordance with the terms of this Order unless and until such designation is removed by agreement of the Parties or by order of the Court.

(b)      Information designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" may be viewed only by:

  i.      Counsel of the receiving party;

  ii.      up to three (3) Designated Party Representatives. Prior to receiving any Designated Materials of the producing party, a Designated Party Representative must execute a copy of the "Agreement to Be Bound by Protective Order," attached hereto as **<u>Exhibit A</u>**. Counsel for the receiving party must retain executed copies of such exhibits;

  iii.      independent experts and stenographic and clerical employees associated with such experts. Prior to receiving any Designated Materials of the producing party, the expert must execute a copy of the "Agreement to Be Bound by Protective Order," attached hereto as

**Exhibit A**. Counsel for the receiving party must retain executed copies of such exhibits;

iv.    the Court and its staff;

v.    any court reporter employed in this litigation and acting in that capacity; and

vi.    any person indicated on the face of the document to be its author or co-author, or any person identified on the face of the document as one to whom a copy of such document was sent before its production in this action.

(c)    Information designated "CONFIDENTIAL" may be viewed only by the individuals listed in paragraph 3(b) above, in addition to the following:

i.    party principals or executives who are required to participate in policy decisions with reference to this action. Prior to receiving any Designated Materials of the producing party, such principals or executives must execute a copy of the "Agreement to Be Bound by Protective Order," attached hereto as **Exhibit A**. Counsel for the receiving party must retain executed copies of such exhibits;

ii.    technical personnel of the parties with whom Counsel for the parties find it necessary to consult with regarding Confidential Information, in the sole discretion of such Counsel, in preparation for trial of this action. Prior to receiving any Designated Materials of the producing party, such principals or executives must execute a copy of the

6

"Agreement to Be Bound by Protective Order," attached hereto as **Exhibit A**. Counsel for the receiving party must retain executed copies of such exhibits; and

iii. stenographic and clerical employees associated with the individuals identified above.

(d)     All Designated Materials, and any and all reproductions of the Designated Materials, must be retained in the custody of Counsel for the receiving party, except that independent experts authorized to view such information under the terms of this Order may retain custody of copies such as are necessary for their participation in this litigation, but only during the course of this litigation. The principals, employees, or other agents of the parties who received information prior to and apart from this litigation that was subsequently disclosed in this litigation as Designated Materials may also retain copies of that information as is necessary for use in their respective businesses.

(e)     A party may request that it be permitted to disclose Designated Material to individuals not permitted by this Order. The requesting party must notify Counsel for the producing party of the Designated Material it seeks to disclose and the identity of the intended recipient. If the request is not resolved consensually between the parties within five (5) business days of such a request, the requesting party may seek relief from the Court.

4.     **Changes or Objections to the Designation of Designated Material.**

(a)     Designated Material disclosed or produced by a party in accordance with this Order will retain its confidentiality designation unless the parties agree to change its designation or the Court orders otherwise. If a party disputes a designating party or non-

party's confidentiality designation(s), the party shall notify the designating party or non-party, and the parties shall meet and confer in an effort to agree upon the appropriate designation. If a dispute arises that cannot be resolved through the meet-and-confer process, any party or affected non-party may seek relief from the Court.

(b)     Designated Materials produced by a non-party will retain their confidentiality designation unless the non-party agrees to change their designation or the Court orders otherwise after providing an opportunity for the non-party to be heard.

(c)     A party who cannot obtain agreement to change a confidentiality designation may move the Court for an order to modify the designation. If the motion affects a document produced by a non-party then, with respect to the motion, that non-party is entitled to the same notice and opportunity to be heard as a party. The party or non-party who designated a document as confidential must show that the designation satisfies Fed. R. Civ. P. 26(c).

**5.     Filing or Using Designated Materials in Court.**

(a)     This Order does not authorize the filing of any document under seal. All documents may be filed only in accordance with Local Rule 5.6

(b)     A party intending to present another party or non-party's Designated Materials at a hearing or trial must promptly notify the other party or non-party so that the other party or non-party is afforded the opportunity to negotiate in good faith a mutually-acceptable protocol for presenting the Designated Materials and, failing agreement, to seek relief from the Court.

**6.** **Source Code**[1]

(a)     For Designated Material marked "RESTRICTED CONFIDENTIAL —
SOURCE CODE" qualifying as Source Code Material, the following additional
restrictions apply:

      i.      Access to a Party's Source Code Material shall be provided only on

"stand-alone" computer(s) (that is, the computer may not be linked to

any network, including a local area network ("LAN"), an intranet or

the Internet). The stand-alone computer(s) may be connected to an

external monitor, keyboard, mouse, and a printer, or a device capable

of temporarily storing electronic copies solely for the limited purposes

permitted pursuant to paragraph 6(a)(xi) below. Additionally, except

as provided in paragraph 6(a)(xi) below, the stand-alone computer(s)

may only be located at the producing-party's Counsel's office(s) or

---

[1] The term "source code," as used herein, refers to computer code, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms, structure of software or hardware designs. Source code includes front-end source code, back-end source code, infrastructure code (i.e. file suitable for input to a configuration management tool), compiled web bundles (i.e. output from tools such as Webpack), object code (i.e., computer instructions and data definitions expressed in a form suitable for input to an assembler, compiler, or other translator), microcode, register transfer language ("RTL"), firmware, and hardware description language ("HDL"), as well as any and all programmer notes, annotations, and other comments of any type related thereto and accompanying the code. Source code can include any of the following, when it has been compiled into an executable program: source files, make files, intermediate output files, executable files, header files, resource files, library files, module definition files, map files, object files, linker files, browse info files, debug files, configuration files, database schema definition files, stylesheets and extended stylesheets (such as Sass files), JSON files, XML files, files containing source code in GoLang, Vue.js, SQL, C, C++, BREW, Java ME, J2ME, assembler, digital signal processor (DSP) programming languages, VHDL, Verilog, other HDL formats, and any other human readable text programming languages.

9

the producing-party's offices;

ii.    The receiving Party shall make reasonable efforts to restrict its requests for such access to the stand-alone computer(s) to normal business hours, which for purposes of this paragraph shall be 8:00 a.m. through 6:00 pm. However, upon reasonable notice from the receiving party, the producing Party shall make reasonable efforts to accommodate the receiving Party's request for access to the stand-alone computer(s) outside of normal business hours. The Parties agree to cooperate in good faith such that maintaining the producing Party's Source Code Material at the offices of its Counsel shall not unreasonably hinder the receiving Party's ability to efficiently and effectively conduct the prosecution or defense of this lawsuit;

iii.    The Producing Party shall provide the receiving Party with information explaining how to start, log on to, and operate the stand-alone computer(s) in order to access the produced Source Code Material on the stand-alone computer(s). The producing Party will comply with reasonable requests from the receiving Party to install specific software tools that allow for effective review of the source code;

iv.    The producing Party will produce Source Code Material in computer searchable format on the stand-alone computer(s) as described above. To the extent practicable, each party shall produce source code in its

native form as it exists in the normal course of business (e.g., source code repositories) including all version control information and any software necessary for viewing such information. If such production is not possible, then source code shall be produced in a directory structure with directory names and file names corresponding to that used in the normal course of business;

v. Reviewing experts may take notes during review on their own devices, which shall not include copying any of the source code itself. Such notes shall not be subject to review by the producing Party. The reviewing experts agree to abide by such other reasonable security procedures as the parties may agree.

vi. The producing Party may visually monitor the activities of the receiving Party's reviewers during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code. The receiving Party's representatives shall take reasonable precautions to monitor the inspection in a manner that precludes viewing activities on computer screens, reading reviewer notes, or listening to any activity taking place. The stand-alone computers shall be configured so that the producing Party may not monitor, or determine, directly or indirectly, (i) the portions of source code viewed by the receiving Party or (ii) the parameters or results of any searches or analyses performed by the receiving Party.

vii.    Access to Designated Materials qualifying as Source Code Material shall be limited to those individuals provided for in Paragraph 3(b). A receiving Party may include excerpts of Source Code Material in a pleading, exhibit, expert report, discovery document, deposition transcript, or other Court document, provided that the Source Code Material is appropriately marked under this Order as "RESTRICTED CONFIDENTIAL – SOURCE CODE" restricted to those who are entitled to have access to them as specified herein, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures, and orders;

viii.    To the extent portions of Source Code Material are quoted in any Document, either (1) the entire Document will be stamped and treated as RESTRICTED CONFIDENTIAL – SOURCE CODE, or (2) those pages containing quoted Source Code Material will be separately stamped and treated as RESTRICTED CONFIDENTIAL – SOURCE CODE. For avoidance of doubt, the following do not constitute copies of source code or lines of source code: directory structures and paths; variable names; function names; document names; filenames; wiki page names; member names; field names; template names; data structures;

ix.    Except as set forth in paragraph 6(a)(xi) below, no electronic copies of Source Code Material shall be made without prior written consent

12

of the producing Party, except as necessary to create documents which, pursuant to the Court's rules, procedures, and order, must be filed or served electronically;

x.    The receiving Party shall be permitted to make a reasonable number of printouts and photocopies of Source Code Material, all of which shall be designated and clearly labeled RESTRICTED CONFIDENTIAL – SOURCE CODE and the receiving Party shall maintain a log of all such files that are printed or photocopied;

xi.    Should such printouts or photocopies be transferred back to electronic media, such media shall be labeled RESTRICTED CONFIDENTIAL – SOURCE CODE and shall continue to be treated as such;

xii.    If the receiving Party's Counsel, consultants, or experts obtain printouts or photocopies of Source Code Material, the receiving Party shall ensure that such Counsel, consultants, or experts keep the printouts or photocopies in a secured locked area in the offices of such Counsel, consultants, or expert(s). The receiving Party may also temporarily keep the printouts or photocopies at: (i) the Court for any proceeding(s); (2) the sites where any deposition(s) relating to the Source Code Material are taken, for the dates associated with the deposition(s); and (iii) any intermediate location reasonably necessary to transport the printouts or photocopies (e.g., a hotel prior to a Court proceeding or deposition); and

xiii.     A producing Party's Source Code Material may only be transported by the receiving Party at the direction of a person authorized under paragraph 6(a)(i) above, on paper or removable electronic media (e.g., a DVD, CD-ROM, or flash memory "stick") via hand carry, Federal Express or other similarly reliable courier. Source Code Material may not be transported or transmitted electronically over a network of any kind, including a LAN, an intranet, or the Internet. Source Code Material may only be transported electronically for the purpose of Court proceeding(s) or deposition(s) as set forth in paragraph 6(a)(x) above and is at all times subject to the transport restrictions set forth herein. But, for those purposes only, the Source Code Materials may be loaded onto a stand-alone computer.

xiv.     In addition to the foregoing, if a producing party, in the course of collecting and reviewing documents responsive to a requesting party's document requests, identifies responsive documents or communications that contain source code snippets, and the document's relevance is not duplicative of access to RESTRICTED CONFIDENTIAL – SOURCE CODE that will be made available for inspection in accordance with this Paragraph 6, such documents shall be produced and clearly labeled "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." Documents so labeled may be handled and viewed in accordance with the protocol enumerated in

Paragraph 3(b) of this Order.

**7.      Inadvertent Disclosure of Designated Material.**

(a)      A party or non-party that receives Designated Material must take reasonable precautions to prevent the unauthorized or inadvertent disclosure of such information. No party will be responsible to another party for disclosure of Designated Material under this Order if the document in question is not labeled or otherwise identified as such in accordance with this Order.

(b)      A party or non-party that discovers it has inadvertently disclosed or produced Designated Material without labeling or otherwise designating it as such in accordance with this Order may give written notice to the receiving party that a produced document is deemed Designated Material. Upon receiving notice of an inadvertent disclosure, the receiving party must treat the document in accordance with the producing party's intended confidentiality designation under the terms of this Order. If the receiving party has disclosed the document before receiving the designation, the receiving party must promptly notify the producing party in writing of each such disclosure. Counsel for the parties will agree on a mutually acceptable manner of labeling or marking the inadvertently produced documents as Designated Materials.

**8.      Privilege Log**

(a)      <u>Contents of Privilege Log</u>.

   i.      <u>General</u>. Unless otherwise agreed pursuant to Paragraph 8(d) below, for any Protected Document withheld on the basis of privilege, immunity, or other protection, the withholding party will produce a

privilege log consistent with the Federal Rules of Civil Procedure and include the following information for each document, organized and provided in an Excel spreadsheet or similar electronic format permitting search and sorting:

A.      unique document identification number;

B.      date and time of communication or document;

C.      document type or form (e.g., e-mail, .PDF, .docx, etc.);

D.      author(s)/sender(s) of the document or communication;

E.      each recipient broken out separately to provide email To, CC, and BCC info;

F.      family relationship;

G.      subject line or document title; or, if that information itself is privileged, a description sufficient to identify the nature and general contents of the document or communication;

H.      privileges or immunities claimed; and

I.      description of the subject matter of the document or ESI sufficient to enable the requesting party to assess the validity of the privilege or immunity claimed.

ii.      <u>Emails Strings</u>. For those documents that contain a series of e-mail communications in a single document ("email string"), it shall be sufficient to log the email string without separate logging of each included communication, but reference to the document as an "email

16

string" should be made in the document description field of the log; and to the extent that different emails within the email string are protected by different privilege bases, the log shall separately identify that within the email string certain emails are subject to one particular privilege claim and other emails within the string are subject to a different privilege claim. Email strings that are not privileged in their entirety should be redacted if they contain responsive, non-privileged content. The Parties will meet and confer if a Requesting Party requests additional information to validate the claim of protection for a specific email string. Such information shall not be withheld upon good cause shown for the request.

iii.   Identification of Counsel. All counsel or their employees (or direct reports for in-house counsel) involved in purportedly privileged communications or work product shall be identified as such in the privilege log or a separate list accompanying the privilege log.

iv.   Timing. Privilege logs must be served by the Producing Party no later than 21 days after the deadline for substantial completion of document production.

(b)   <u>Format of Privilege Log</u>. The privilege log shall be produced as a searchable PDF file.

(c)   <u>Challenges to Privilege Logs</u>. If a Requesting Party believes in good faith that one or more items in a Producing Party's privilege log should be

produced and are inappropriately being withheld, then it shall raise the issue as to each log entry with the Producing Party in writing with reasonably sufficient detail so that the Producing Party may understand the Requesting Party's complaint. Within seven (7) business days, the Producing Party shall respond in writing. If the response does not satisfy the Requesting Party, then the Parties shall meet and confer and if the dispute as to the privileged nature of the material cannot be resolved, then any party may seek relief from the Court as to the specific log entries. Nothing in this procedure to challenge a privilege log modifies the Producing Party's burden to establish the privileged nature of the withheld document.

(d)      <u>Privilege Log Exemptions</u>. The parties agree that the following protected documents need not be logged or indexed: Responsive communications between a party and its undersigned Counsel, or between Plaintiff and its previously retained counsel, Elaine Bredehoft, on or after May 22, 2023; and Attorney work product concerning this action created by Counsel to a Party.

(e)      <u>Preservation of Protected Documents</u>. Notwithstanding the above, all Protected Documents should be preserved in the event of a later dispute with respect to the propriety of any privilege claim or the sufficiency of the privilege log. The Parties agree that they will confer at a later time to determine whether any other categories of privileged documents can be excluded from the logging requirement and attempt to agree on formats

designed to reduce the burden associated with privilege log drafting, such as "categorical" or "metadata only" privilege logs.

**9.    Inadvertent Disclosure of Protected Documents.**

(a)    Nothing within this Order will prejudice the right of any party to object to the production of any discovery material on the grounds that it is a Protected Document.

(b)    A party or non-party that discovers that it has inadvertently disclosed or produced a Protected Document must promptly notify the receiving party and describe the basis of the claim of privilege or protection. If the party or non-party provides such notice and description, the privilege or protection is not waived.

(c)    A party that is notified or discovers that it may have received an inadvertently disclosed or produced Protected Document must comply with Fed. R. Civ. P. 26(b)(5)(B).

**10.    Disclosure of Designated Material in Response to Lawful Subpoena.**

(a)    The party to whom Designated Material has been produced may disclose the information if obligated to do so in response to a lawful subpoena, provided that the subpoenaed party gives prompt notice to Counsel for the designating party and permits sufficient time for the designating party to intervene and seek judicial protection from enforcement of the subpoena and/or entry of an appropriate protective order in the action in which the subpoena was issued.

**11.    Termination of this Action.**

(a)    Within sixty (60) days of the final termination of this action, including any and all appeals, each party must purge all Designated Material from all machine-readable

media on which it resides and (i) destroy or return all Designated Material to the party that produced the information, including any copies, excerpts, and summaries of that information, and (b) notify the disclosing or producing party or non-party that it has returned or destroyed all Designated Material within the 60-day period.

(b)     With respect to paper copies, return or destruction of the Designated Materials is at the option of the producing party. Notwithstanding the foregoing, Counsel for each party may retain all pleadings, briefs, memoranda, motions, and other documents filed with the Court that refer to or incorporate Designated Material, and Counsel will continue to be bound by this Order with respect to all such retained information after the conclusion of this action. Further, attorney work product that contains Designated Material need not be destroyed, but, if it is not destroyed, the person in possession of the attorney work product will continue to be bound by this Order with respect to all such retained information after the conclusion of this litigation.

**12.     Notice.**

(a)     Transmission by e-mail or facsimile is acceptable for all notification contemplated by this Order.

**13.     Service of this Order on a Non-Party.**

(a)     A party serving a subpoena on a non-party must simultaneously serve a copy of this Order and of Local Rule 5.6.

**14.     Effect on Discovery.** Complying with the terms of this Order shall not:

(a)     operate as an admission by any party that particular Designated Material contains or reflects, or does not contain or reflect, trade secrets or any other type of Confidential Information;

(b)     prejudice the rights of any party to object to the production of documents or testimony it considers outside the appropriate scope of discovery for any reason;

(c)     prejudice the rights of any party to object to the relevance, authenticity, or admissibility into evidence of any document, testimony, or other evidence;

(d)     prejudice the rights of any party to seek a determination by the Court whether any document, whether or not marked CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY, is subject to the terms of this Order;

(e)     prejudice the rights of any party to petition the Court for a further protective order relating to any purported Designated Material;

(f)     prejudice the rights of any party to move the Court to broaden or restrict the right of access to any use of particular documents; or

(g)     prevent the parties to this Order from agreeing to alter or waive the provisions or protections provided for herein with respect to any particular document.

**15.     Modification of this Order.**

(a)     This Order may be modified by agreement of the parties, subject to approval by the Court. The Court may modify the terms and conditions of this Order for good cause, in the interest of justice, or on its own order at any time.

16.     **Survival of Obligations.**

(a)     After termination of this action, the provisions of this Order shall continue to be binding, except with respect to those documents and information that became a matter of public record. This Court shall retain and have continuing jurisdiction over the parties and recipients of Confidential Information and Designated Materials for enforcement of the provisions of this Order.

IT IS SO ORDERED.

Dated: March 8, 2024

*s/ John F. Docherty*
JOHN F. DOCHERTY
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Plus One, LLC,                                        Case No. 23-cv-2016 (KMM/JFD)

                  Plaintiff,

    v.

Capital Relocation Services L.L.C.,

                  Defendant.

_____

## EXHIBIT A

## AGREEMENT TO BE BOUND BY PROTECTIVE ORDER

I, _____ [print or type full name], state:

1.    My business address is _____

_____ ;

       My present employer is _____ ;

       My present occupation or job description is _____ ;

2.    I have been informed of and have reviewed the Protective Order entered in this case.

3.    I will comply with all provisions of the Protective Order. I agree to keep confidential all information provided to me pursuant to the Protective Order in accordance with the restrictions therein, and to be subject to the authority of this Court in the event of any violation or dispute related to the Protective Order.

4.      I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

[Signature]

Executed On _____

_____

[Printed Name]

Exhibit C

**General Data Delivery Format**

Production format will be in Relativity format and should include a delimited file containing document and meta data fields, an Opticon load file for images, single page image files, document-level text files, and native files for electronically stored information (ESI) as outlined.

**Delimited Text File (.DAT)**

The delimited text file should contain the fields listed below. Standard "Concordance" delimiters are preferred.

| Column | Character | ASCII Number |
|---|---|---|
| Quote | þ | 20 |
| Multi-entry | ; | 254 |
| New line | ® | 59 |
|  |  | 174 |

| Field Orders | Field Name | Field Description/Contents | Format | Sample |
|---|---|---|---|---|
| 1 | Prod Beg Bates | Production begin Bates | Fixed-Length Text: 40 | ACME0000001 |
| 2 | Prod End Bates | Production end Bates | Fixed-Length Text: 40 | ACME0000010 |
| 3 | Prod Group Begin | Production attachment range begin Bates – the first Bates number of the first document in the document family | Fixed-Length Text: 40 | ACME0000001 |
| 4 | Prod Group End | Production attachment range end Bates – the last Bates number of the last document in the document family | Fixed-Length Text: 40 | ACME0000015 |
| 5 | Sort Date | Sent date for emails, propagated to email attachments; last modified date for non-email application files; coded date for scanned documents | Date\time: mm/dd/yyyy hh:mm AM/PM | 10/31/2017 9:15 PM |

| Field Orders | Field Name | Field Description/Contents | Format | Sample |
|---|---|---|---|---|
| 6 | Doc Type | Application type or coded document type for scanned documents | Single Choice | Outlook Message File |
| 7 | Document Class | Class of document: Email, Attach, Edoc, Hard Copy | Single Choice | Email |
| 8 | Source | Name of processed file, i.e. PST/NSF | Single Choice | Garland_Judy.pst |
| 9 | Custodian | Custodian's name | Multi-Choice | Garland, Judy |
| 10 | All Custodians | All custodians for which a record existed before de-duplication | Muliti-Choice | User, Jane; Nelson, Prince R.; Lewis, Sinclair |
| 11 | Virtual Path | Path of original file or email, not including the file name | Multiple Choice: 255 character maximum | \Original file path\Subfolder 1\Subfolder 2 |
| 12 | Filename | Full file name and extension of file | Fixed-Length Text: 400 | filename of document.doc |
| 13 | File Extension | File extension | Single Choice | DOC |
| 14 | File Size | File size in KB | Decimal | 235809 |
| 15 | Unified Author | Name of e-mail sender; author of email attachment or application file; coded author for scanned documents | Long Text | Sinclair Lewis |
| 16 | Unified Subject | Email Subject line or Application Document Title; coded Subject for scanned documents | Long Text | RE: Example of email subject |
| 17 | From | Email from SMTP address | | lewiss@acme.com |
| 18 | Recipient | Email to recipients SMTP address | Long Text | garlandj@acme.com |
| 19 | CCs | Names of all people copied on e-mail; coded CCs for scanned documents | Long Text | lewiss@acme.com;garlandj@acme.com |

| Field Orders | Field Name | Field Description/Contents | Format | Sample |
|---|---|---|---|---|
| 20 | BCCs | Names of all people blind copied on e-mail; coded BCCs for scanned documents | Long Text | lewiss@acme.com;garlandj@acme.com |
| 21 | Email Date Sent | Email sent date\time | Date\time: mm/dd/yyyy hh:mm AM/PM | 10/31/2017  9:15 PM |
| 22 | Email Time Sent | Email time sent | Fixed-Length Text: 20, hh:mm:ss | 9:15:42 PM |
| 23 | Email Date Received | Email date received | Date\time: mm/dd/yyyy hh:mm AM/PM | 10/31/2017  9:15 PM |
| 24 | Email Time Received | Email time received | Fixed-Length Text: 20, hh:mm:ss | 9:15:42 PM |
| 25 | Email Attach Count | Number of Email attachments; if no attachments then this should be "0" | Whole Number | 1 |
| 26 | Message ID | Unique identifier for email | Long Text | 2C73522B-1267-4122-83DB-346263C11E5E@acme.com |
| 27 | Conversation Index | Used to identify emails in a discussion thread | Long Text | 01D1DC693E236E86A6A4E242381499E97531602 7F7BA |
| 28 | App Last Modified | Application date last modified | Date\time: mm/dd/yyyy hh:mm AM/PM | 10/31/2017  9:15 PM |
| 29 | App Time Last Mod | Application time last modified | Fixed-Length Text: 20, hh:mm:ss | 9:15:42 PM |
| 30 | App Created Date | Application created date | Date\time: mm/dd/yyyy hh:mm AM/PM | 10/31/2017  9:15 PM |
| 31 | App Time Created | Application time created | Fixed-Length Text: 20, hh:mm:ss | 9:15:42 PM |
| 32 | App Date Last Accessed | Application date last accessed | Date\time: mm/dd/yyyy hh:mm AM/PM | 10/31/2017  9:15 PM |

| Field Orders | Field Name | Field Description/Contents | Format | Sample |
|---|---|---|---|---|
| 33 | App Time Last Accessed | Application time last accessed | Fixed-Length Text: 20, hh:mm:ss | 9:15:42 PM |
| 34 | App Last Print | Application last printed date | Date\time: mm/dd/yyyy hh:mm AM/PM | 10/31/2017  9:15 PM |
| 35 | App Last Print Time | Application last printed time | Fixed-Length Text: 20, hh:mm:ss | 9:15:42 PM |
| 36 | App Last Author | Application last author | Long Text | Prince R. Nelson |
| 37 | MD5 Hash | Hash value of e-mail, attachment or application file | Fixed-Length Text: 255 | AA98A7CCB86C7E5CD95504BE368BA673 |
| 38 | Time Zone Field | Time zone used when processing documents | Fixed-Length Text: 40 | (UTC) Coordinated Universal Time |
| 39 | Relativity Native Time Zone Offset | Contains GMT offset (i.e. "-4" for EST, "0" for GMT) | Decimal | -5 |
| 40 | Confidential | Designation applied to document | Fixed-Length Text: 255 | Confidential |
| 41 | Redacted | Markup applied to document | Fixed-Length Text: 255 | Redacted |
| 42 | Native Path | Path to native file on production volume | Fixed-Length Text: 255 | .\VOL001\NATIVE\001\ACME0000001.xls |
| 43 | Text Path | Path to text file on production volume | Fixed-Length Text: 255 | .\VOL001\TEXT\001\ACME0000001.txt |

**Opticon Load File**

An Opticon load file should be provided to import images. The Opticon load file must contain the following comma delimited data:

| Column | Comments |
|---|---|
| IMAGE KEY | Must match Bates number applied to page\image |
| VOLUME ID | Volume name |
| FILE PATH | Path including image filename and extension |
| DOCUMENT BREAK | "y" for the first page of each document, blank for each subsequent page |
| BOX BREAK | (Only if requested) "y" for the first page of each box, blank for each subsequent page |
| FOLDER BREAK | (Only if requested) "y" for the first page of each folder, blank for each subsequent page |
| PAGES | Page count of document applied on first page of document, blank for each subsequent page |

Sample:

```
ACME_0000000001,VOLUME_001,.\VOLUME_001\IMAGES\IMG001\ACME_0000000001.JPG,Y,,,1
ACME_0000000002,VOLUME_001,.\VOLUME_001\IMAGES\IMG001\ACME_0000000002.TIF,Y,,,5
ACME_0000000003,VOLUME_001,.\VOLUME_001\IMAGES\IMG001\ACME_0000000003.TIF,,,,
ACME_0000000004,VOLUME_001,.\VOLUME_001\IMAGES\IMG001\ACME_0000000004.TIF,,,,
ACME_0000000005,VOLUME_001,.\VOLUME_001\IMAGES\IMG001\ACME_0000000005.TIF,,,,
ACME_0000000006,VOLUME_001,.\VOLUME_001\IMAGES\IMG001\ACME_0000000006.TIF,,,,
ACME_0000000007,VOLUME_001,.\VOLUME_001\IMAGES\IMG001\ACME_0000000007.JPG,Y,,,2
ACME_0000000008,VOLUME_001,.\VOLUME_001\IMAGES\IMG001\ACME_0000000008.JPG,,,,
```

**Images**

Documents should be converted to black and white, single-page 300 dpi TIFF files with Group IV compression. Documents containing photographs or significant color should be converted to color, single-page 300 DPI JPG files with JPG compression. Image files should be named after their corresponding Bates number.

**Text Files**

Each record should have a corresponding document-level text file containing document text. Text should be extracted from native ESI. OCR should be performed on image-based files with no extractable text, hard copies, and redacted documents. Text files should be named after the beginning Bates number of their corresponding document.

**Native Files**

Spreadsheet files, database files, media files, and other files as agreed to by the parties should be produced in native format with a corresponding placeholder image. Native files should be given a single Bates number and the same number should be applied to the placeholder image along with any confidentiality designations. Files should be named after their Bates number and include the original file extension of the native file.

**Hard Copies**

Hard copy should be scanned according to the above image, text, and load file specifications. Documents should be logically broken with attachments ranges provided where applicable. If parties agree to exchange coding, coding will include the following fields:
Doc Date, Doc Type, Author, Recipient, CC, BCC, and Subject.

**Production Media**

Data should be transferred via USB thumb drive or hard drive. Media should be encrypted using Windows BitLocker or equivalent. Data may also be transmitted via secure FTP.

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   **0:23-CV-02016-KMM-JFD**

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for   **Information Technology Management Services, Inc.**
on   **9/09/2024:**

[X] I served the subpoena by delivering a copy to the named person as follows: **Hoan Le**, who is designated by law to accept service of process on behalf of **Information Technology Management Services, Inc.** at **12351 Firestone Ct, Fairfax, VA 22033 on 09/09/2024 at 3:38 PM**

**I delivered the documents to Hoan Le with identity confirmed by subject saying yes when named. The individual accepted service with direct delivery. The individual appeared to be a gray-haired Asian male contact 35-45 years of age, 5'6"-5'8" tall and weighing under 80 lbs.**; or

[ ] I returned the summons unexecuted because

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

**$ 0.00**

My fees are **$ 0.00** for travel and **$ 170.00** for services, for a total of **$ 170.00**.

I declare under penalty of perjury that this information is true.

Date:  09/09/2024

_____
*Server's signature*

**Bidemi Bolarin**
*Printed name and title*

13724 Winding Oak Cir.
203
Centrevilee, VA 20121
_____
*Server's address*

Additional information regarding attempted service, etc:



EXHIBIT
2





EXHIBIT
3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

Plus One, LLC,                                    Case No. 23-cv-2016 (KMM/JFD)

Plaintiff,

v.                                                **FIRST AMENDED COMPLAINT**

Capital Relocation Services L.L.C.,               **DEMAND FOR JURY TRIAL**

Defendant.

Pursuant to Fed. R. Civ. P. 15(a)(1)(B) and LR 15.1, Plaintiff pleads the following against Defendant, and alleges as follows:

## INTRODUCTION

1.     This action arises out of Defendant Capital Relocation Services L.L.C.'s misappropriation of Plaintiff Plus One, LLC's proprietary trade secrets, Defendant's breach of its obligations under a non-disclosure agreement, and Defendant's intentional interference with Plaintiff's contracts and business opportunities by exploiting extensive amounts of confidential information and trade secrets—all to develop a nearly identical software product that is in direct competition with Plaintiff.

## THE PARTIES

2.     Plaintiff Plus One, LLC ("Plus" or "Plaintiff") is a Minnesota limited liability company and a subsidiary of Plus Relocation Services, LLC, located at 600 Highway 169 South, Suite 500, Minneapolis, MN 55426. By virtue of the entities and individuals who ultimately own all the interests of Plus being citizens of Minnesota, Plus is a citizen of the State of Minnesota.

3.      Defendant Capital Relocation Services L.L.C. ("CapRelo" or "Defendant") is a Virginia limited liability company located at 108 Carpenter Drive, Sterling, VA 20164. On information and belief, and upon reasonable inquiry of publicly available sources, CapRelo's sole member and owner is a citizen of Virginia, and CapRelo is therefore a citizen of Virginia.

4.      This Court has subject matter jurisdiction over this matter pursuant to Plaintiff's federal trade secret claim arising under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*, and under 28 U.S.C. § 1331.

5.      This Court also has subject matter jurisdiction over this matter under 28 U.S.C. § 1332: complete diversity exists because, as alleged herein, Plaintiff and Defendant are citizens of different States and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Defendant at least because Defendant consented to the jurisdiction of this Court for "[a]ny action arising out of, relating to or in connection with" the parties' Non-Disclosure Agreement ("NDA") that is central to this dispute and the claims asserted herein. (*See* Ex. A, NDA, ¶ 8.)

8.      This Court also has personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Minnesota Long Arm Statute: CapRelo regularly transacts business within the State of

2

Minnesota, and CapRelo's breach of the NDA and misappropriation of Plaintiff's trade secrets has caused injury to Plaintiff within the State of Minnesota.

9.     Venue is proper in this District under the NDA and pursuant to 28 U.S.C. § 1391(c)(2) because CapRelo has misappropriated the trade secrets of a Minnesota limited liability company whose members are Minnesota residents. CapRelo committed acts of breach, torts, and misappropriation in and directed to this District.

## BACKGROUND

## I.     Relocation Services Prior to Plus's Development of the Point C Software

10.     Employee relocation management services is a nuanced industry by which the relocation management service provider operates as a facilitator between a company and its employees who are, pursuant to the company's request and as part of employment, relocating to a new area.

11.     Companies providing relocation management services, such as Plus and CapRelo, act as third-party suppliers of such services to assist businesses, both small and large, in facilitating the complex process of employee relocation.

12.     Prior to Plus's development of the highly innovative Point C software, traditional relocation management services included reimbursement of direct costs, such as movers and closing costs, all of which were limited by the employer's relocation benefits policy.

13.     Historically, such relocation benefit policies were rigid and would require the relocating employee to request "exceptions," which encompassed benefits that were outside of the traditional benefits falling squarely within the employer's policy. For

example, among other things, transportation costs for visiting the new location or additional days needed for temporary housing were considered "exceptions."

14.     Prior to Point C changing the industry, so-called "Core-Flex" software programs assisted employers with managing their employees' election of "core" policy benefits and limited "flex" benefits providing a few additional options. However, at the time Point C was developed, these programs lacked flexibility, merely complied with employers' rigid relocation benefit policies, and prohibited employees from modifying their initial relocation benefits selected at the outset of their relocation, among other shortcomings.

15.     As a result, prior to Point C, review and acceptance of exceptions were costly and consumed resources for both companies and relocation management service providers alike.

16.     The provision of relocation management services and related benefits have remained substantially unchanged for decades. That is, until Point C came onto the scene.

## II.     Plus and its Innovative Point C Software

17.     Plus is an industry leader in the offering of relocation management services to companies and other employers. To satisfy longstanding yet unsatisfied industry needs, Plus developed an innovative and automated software platform—called "Point C®"—that can be integrated into a company's existing benefits services framework to provide greater flexibility in meeting a relocating employee's needs and, meanwhile, save significant costs and fees associated with relocation services.

18.     Notably, Point C is intended for employers and their relocating employees and is not accessible without a license from Plus, which comes with robust confidentiality and usage restrictions. In other words, Point C is not generally accessible to the public, but is restricted to companies and their relocating employees that are under contract with Plus for Point C.

19.     Among other things, Point C is a novel credit-based system which allows employees to select eligible benefits for their authorized move with their employer throughout the duration of their relocation.

20.     Beyond the credit-based system, Point C provides additional innovative features, such as the provision of traditional, non-traditional, and hybrid benefits to employees, while also eliminating "exceptions" within the relocation industry. Point C fully automates the relocation benefits selection process, minimizing employers' time and resources to approve, deny, and otherwise manage benefits and exceptions.

21.     To develop Point C, Plus made significant investments into market research to explore what solutions both employers and their employees sought to improve the relocation experience. Among other valuable results uncovered from that research, Plus discovered that employees were unhappy with being bootstrapped to the standard listing of benefits that had been around for decades, and yearned for more flexibility and options to meet their relocation needs.

22.     In addition, the research revealed that the profile of a typical relocating employee was changing because of globalization, technological advancements, and other

evolving generational needs, which consequently rendered traditional relocation benefits inadequate.

23. Armed with the results of this valuable industry research, Plus immediately began working on a solution to meet the relocating employees' needs by soliciting partners to develop an innovative software—what eventually became Point C® (registered for relocation software services as U.S. Trademark Reg. No. 6,185,952).

24. Plus engaged a third-party developer—C3LX—to begin developing its Point C software. Working together, Plus and C3LX ultimately developed a serviceable software product that Plus was able to begin rolling out with Plus clients. As part of these client agreements, all information was kept confidential, and the client's relocating employees were to provide feedback on Point C. In other words, the client's relocating employees utilized "beta" versions of Point C to select benefits and provide feedback to Plus, all to further develop Point C into what it is today.

25. The feedback from the test users aligned with that of Plus's independent market research—generally, a need for more customizable relocation benefits. This was no small feat, because the landscape of the relocation benefits sector had remained resistant to change and stagnant for decades.

26. For example, relocation management companies ("RMCs") historically derived their revenues from suppliers with whom they had pre-existing relationships, so creating software that allowed for the requested customizable relocation benefits required a complete overhaul of a pre-existing industry revenue structure. Given this revenue structure, cancellation or modification of previously selected benefits was not an option.

27.     As part of Point C's solution, Plus sought out novel merchant and services partners to revamp the pre-existing revenue structure. This required the creation of new roles for individuals to not only seek out partners but enter into agreements to provide services with unique benefits providers. Such providers included modern companies not previously part of employers' relocation packages, such as Wayfair, IKEA, Home Depot, and Uber, and other vendors that would agree to offer benefits and items at select pricing for relocating employees.

28.     Ultimately, this advanced into the development of a proprietary software algorithm and credit methodology process that serves as the foundation of Point C. As discussed above, Point C is a credit-based system. The algorithm and other Point C design elements enable Point C to create a novel dollars-to-credit translation based on both the particular pricing obtained through Plus's client relationship and the employer's requests.

29.     By way of example, Point C offers a move-out cleaning option as a potential benefit; however, that cleaning benefit depends on the square footage of the property. Plus works with the employer and vendor to determine the particular pricing (i.e., the pricing methodology), for particular property sizes, which is then utilized by the Point C algorithm. When the applicable property size is selected by the employee, Point C provides the amount of points the benefit "costs" to the employee in credits, utilizing both Point C's proprietary pricing methodology and algorithm.

30.     In addition to the proprietary algorithm and underlying source code that makes up Point C, Plus devised its own unique Application Programming Interfaces

("APIs"), which themselves constituted, in part, Plus's confidential information and trade secrets embodied by Point C.

31.     Plus's Point C APIs are unique to Point C because they allow for integration with clients' and/or RMCs' existing software and allow for Point C to be overlaid on top of that software, which maintains the client's existing system and incorporates Point C.

32.     Furthermore, the Point C APIs contain code directing the underlying systems and databases to "talk" to one another, which directs the overall software where and what to write to, and read from, in order to reach the result ultimately displayed to the end user of Point C. In other words, the APIs themselves embody a proprietary process that tell the system and databases when and what information to invoke.

33.     An additional novel aspect of Point C is its unique structure that allows each client to be able to divide its Point C instantiation into various sub-clients, where those sub-clients are all under the client umbrella. For instance, where a particular client (i.e., employer) has multiple companies under its corporate umbrella, Point C can be sub-divided to exist separately from those companies, while remaining under the control of the overarching client's relocation specialist. This allows for more customizable features across sub-companies without having to deploy a new instance of Point C across all sub-companies, and also allowing the sub-companies, and overarching company, to maintain their existing systems' infrastructure.

34.     Though the general concept of an API may have been previously used within the industry, Plus's specific APIs embody significant aspects of the proprietary Point C

credit methodology and algorithm because those, in-part, define the API given the constant exchange occurring between the database, software infrastructure, and end-user interface.

35. As indicated above, within Plus's Point C platform and software are incorporated a number of highly confidential, proprietary trade secrets. These include the software, source code, algorithm, APIs, and methods embodying the proprietary credit pricing methodology, as well as the systems, designs, and components embodying the following highly innovative and valuable aspects of the Point C software:

a) Implementation of a credit-based relocation platform, where benefits are selected and created by users, as opposed to, for example, utilizing a restrictive pre-determined relocation policy with benefit explanations, where Plus's proprietary algorithm enables a specific credit-expenditure for the selected benefits based on its proprietary pricing;

b) Elimination of exception requests by the relocating employees and the associated costs for their employers under traditional relocation benefits platforms, accomplished via Plus's proprietary pricing and algorithm;

c) Enablement of relocating employees to have choice and control while designing their own highly personalized and customizable relocation package as opposed to adhering to a strict policy of benefits, which is enabled by Plus's proprietary pricing and credit translation algorithm, among other novel aspects of the Point C software such as its user interface;

d) Dedicated administration site with novel capabilities for reporting benefit selections and utilization for overall program analysis that is enabled via

Plus's proprietary algorithm—in addition to the aspects referenced above, the algorithm offers unique data to employers concerning their relocating employees' benefits selections, timing of the employees' benefits selections, benefits offered to relocating employees, thereof, and overall status and/or maintenance of employees' moves;

e)  Allowance of automated benefits population within the Point C user interface, consisting of a novel blend of traditional, non-traditional, and hybrid benefits resulting from Plus's significant industry research; and

f)  Reduction of relocation managers and consultants workloads due to the shift in service delivery approach and the novel aspects of Point C referenced above;

(collectively, the "Trade Secrets").

36.  The Trade Secrets comprise these aspects and information listed above, both individually and, importantly, in combination given the fact that such a comprehensive software solution was never available within the relocation services before Point C.

37.  Notably, Point C is distinguishable from and superior to so-called "Core-Flex" programs, because it offers more complete flexibility to employees for when to select and/or modify their benefit elections, and an unprecedented diverse and large-scale array of selectable benefits, many of which were typically only allowed via an employee's request of an exception to the employer's relocation policy.

38.  After seeing the multitude of success and overwhelmingly positive client feedback concerning Point C, other relocation management services providers, such as

10

CapRelo, sought to replicate Point C. Until CapRelo misappropriated Plus's confidential information and trade secrets, those efforts failed.

## III. The Prior Relationship Between Plus and Walmart's Other Relocation Management Companies

39.     The relocation management services industry has a multitude of competitors, including Plus Relocation Services, LLC (Plus's parent company), CapRelo, and Sirva/BGRS. Some competitors provided "Core-Flex" software that mirrored employers' rigid relocation policies and were an option to Walmart.

40.     Plus and CapRelo have always been competitors in the benefits management services space.

41.     While CapRelo had been providing services to Walmart Inc. ("Walmart") in connection with its relocation services needs for years, Walmart eventually began seeking other relocation services providers when it felt the need for a more innovative technological approach that CapRelo and their current relocation management providers could not fulfill.

42.     None of Walmart's pre-existing RMCs, including CapRelo, had any viable software possessing the novel features or Trade Secrets of Point C.

43.     Starting in May 2020, Plus began engaging with Walmart to explore a relationship to provide Walmart with relocation benefits selection services. This included extensive work on Plus's behalf, including a multitude of meetings with high-level Walmart executives and conducting a significant security assessment with Walmart, requiring revisions to Point C to meet Walmart's security needs.

11

44.     In October 2020, Jackie Grube, a Walmart relocation representative, notified Plus that it was moving forward with Point C and that it would proceed with user testing with Walmart's relocating employees.

45.     In or about March of 2021, Walmart hosted a "supplier summit" with its current relocation management providers to announce its decision that it was entering into an agreement with Plus to utilize Point C.

46.     Given Walmart's pre-existing relationships with its relocation management providers, Walmart requested that each relocation management provider work with Plus to implement Point C into the pre-existing RMCs' systems—including CapRelo.

## IV.     The Parties' NDA and Mutual Relationship with Walmart

47.     On June 18, 2021, Plus entered into a Software-as-a-Service Agreement with Walmart (the "SaaS Agreement," (Doc. 47 at 4–77)) to provide Walmart with its Point C platform and software for relocation benefit selection services for Walmart employees, both domestically and internationally.

48.     The SaaS Agreement contained a confidentiality provision, requiring any receiving party to "maintain the confidentiality of the Confidential Information" and "protect the Confidential Information at least as well as it does its own valuable and sensitive information of a similar nature."

49.     Prior to the execution of the SaaS Agreement, Walmart utilized other RMCs services, including CapRelo, for its employee relocation services.

50.     Given the pre-existing software architectures in place because of its relationships with its RMCs, Walmart requested that the RMCs work alongside Plus to

integrate Point C into Walmart's pre-existing employee relocation framework. This included a request that Plus and CapRelo work hand-in-hand and integrate Point C with CapRelo's move management software.

51. Accordingly, Plus and CapRelo entered into an NDA on March 31, 2021, by which Plus would disclose confidential information relating to Plus's proprietary software, source code, algorithm, methods, systems, and components—including extensive technical documents, underlying system architectures, interfaces, components, API specifications, and internal presentations explaining the operability and functionality—operating together to form Point C for the sole purpose described in the NDA. (*See* Ex. A, Preamble and ¶ 4.)

52. The NDA also bound all of CapRelo's directors, officers, employees, affiliates, agents, and advisors (collectively, the "Representatives").

53. The NDA defines CapRelo and its Representatives collectively as the "Receiving Party" and Plus as the "Disclosing Party." (*Id.* at Preamble.)

54. The NDA defines Confidential Information as "rights in trade secrets . . . and any other intellectual property rights (registered or unregistered) throughout the world" and further covered "information or material regarding products, services, business processes . . . and other related information that is provided to either party, including all original documents . . . whether in oral, written, visual, graphic, electronic, machine recognizable, or other medium." (*See* Ex. A, ¶ 1(a).)

55. The NDA's definition of Confidential Information covers the Trade Secrets, among other information.

56.    The NDA further requires that "the Confidential Information is and shall remain the property of Disclosing Party and all right, title and interest in and to the Confidential Information shall be and remain vested in Disclosing Party [i.e., Plus]." (*Id.* ¶ 2.)

57.    Among other things, the NDA set forth the following obligations upon CapRelo and its Representatives:

> Receiving Party agrees that it shall use Disclosing Party's Confidential Information solely for the Discussions Receiving Party shall maintain the confidentiality of Disclosing Party's Confidential Information with at least the same degree of care that it uses to protect its own Confidential Information, but in any event shall use at least commercially reasonable measures to protect the confidentiality of and avoid disclosure of Disclosing Party's Confidential Information. Receiving Party further agrees that Disclosing Party's Confidential Information shall be kept confidential and Receiving Party agrees it shall not disclose any of Disclosing Party's Confidential Information to employees or to third parties; provided, however, that any Confidential Information may be disclosed to Receiving Party's Representatives who need to know the Confidential Information for the Discussions and have been informed by the Receiving Party of this Agreement and the obligations of such Representative to protect Disclosing Party's Confidential Information hereunder.. Receiving Party also agrees to only make copies of Confidential Information as are necessary to evaluate the Discussions. Receiving Party shall promptly notify Disclosing Party in the event of any unauthorized use or disclosure of Disclosing Party's Confidential Information.

(*See* Ex. A, ¶ 4.)

58.    The NDA also required that, even in the event of termination of the NDA, "with respect to Confidential Information disclosed to Receiving Party that is held by Disclosing Party as a trade secret, Receiving Party's obligations, and Disclosing Party's rights, hereunder shall continue as long as that Confidential Information remains a trade secret." (*See id.* ¶ 6.)

14

V.    **CapRelo's Extensive Access and Exposure to Plus's Trade Secrets Under the NDA**

59.    Once the parties entered the NDA, Plus and CapRelo worked regularly together, hand-in-hand to integrate Point C into Walmart's existing relocation program and integrate directly with CapRelo's relocation/move management software. On April 6, 2021, representatives from Plus, CapRelo, and Walmart attended a full demonstration of Point C.

60.    On July 20, 2021, Plus and CapRelo attended an official kick-off for Walmart's implementation of Point C. Weekly project meetings between CapRelo, Plus, and Walmart ensued.

61.    On September 2, 2021, Plus provided CapRelo with a Point C technology overview for a full integration into Walmart's relocation program and CapRelo's move management technology. Over the next seven months, the parties engaged in extensive technical conversations to prepare for the official launch of Point C within Walmart's relocation program.

62.    On November 2, 2021, Plus and CapRelo met to further discuss and define the administrative functionality of Point C and CapRelo's role in adapting Point C within Walmart's relocation program. Shortly after this meeting, Plus granted CapRelo access via Plus's proprietary application programming interface ("API") to facilitate integration with Walmart's relocation program and CapRelo's move management system's architecture.

63.    Present at each of these meetings was a CapRelo Representative by the name of Karen Kazery (f/k/a Karen Pocius).

64.     Ms. Kazery worked at CapRelo for over thirteen years in various roles, including as a director of operations and operations manager.

65.     Upon information and belief, Ms. Kazery left CapRelo at some point in November 2021 and accepted a role with Walmart in Walmart's global business services division, where she assisted with the relocation of Walmart associates and personnel.

66.     Ms. Kazery had access to the Trade Secrets during her time at both CapRelo and Walmart, which included technical documents, underlying system architectures, interfaces, components, algorithm, source code, API specifications, and internal presentations explaining the operability and functionality of Point C, such as Point C's innovative exceptions-eliminating platform and credit-based system. CapRelo also had access and exposure to this information under the NDA.

67.     In addition to CapRelo's interfering actions, Ms. Kazery played a critical role in causing Walmart's partial termination of the SaaS Agreement so as to substitute out Plus for CapRelo.

**VI.    CapRelo's Misappropriation of Plus's Trade Secrets to Develop its Own Copycat Software**

68.     Starting in 2021, Walmart began utilizing Point C for its employees relocation benefits selection services needs.

69.     CapRelo had been working on its own completely different relocation benefits software, but had been unsuccessful in developing a viable program.

70.     During CapRelo's access to the Trade Secrets and Walmart's utilization of Plus's Point C platform and software, CapRelo purported to develop its own benefits services software named "CompanionFlex."

71.     CompanionFlex is substantially similar to Point C and has many of the same features, such as utilizing a widget-based platform where "the employee can view all available benefits options they've been assigned and choose what they want to use." (*See, e.g.*, Ex. B, CapRelo's CompanionFlex Article; *see also* Doc. 23 (Decl. of A. Kubitschek in support of Motion for Preliminary Injunction), ¶¶ 48–51.)

72.     CompanionFlex incorporates the elimination of benefits exceptions, provides relocating employees greater flexibility in their benefits options, and reduces the workloads of relocation managers via a credit-based benefits selection system, all of which were supplied to CapRelo under the NDA.

73.     CompanionFlex incorporates a dedicated administration site with the ability to report benefit selections and utilization for overall program analysis. *See, e.g.*, CapRelo's Linkedin Post regarding CompanionFlex (June 28, 2023), https://www.linkedin.com/posts/caprelo_companionflex-experience-activity-7079911199705833472-JaQ6 (last accessed June 29, 2023).

74.     CompanionFlex requires a similar API structure to that of Point C, where the overarching software can be overlaid on top of employers' pre-existing systems and CapRelo's move management technology.

75.     The multitude of technical presentations, documents, and information pertaining to Point C, all provided to CapRelo under the NDA's and SaaS Agreement's

confidentiality restrictions, gave CapRelo a detailed roadmap to develop a competing software application containing the functionality, features, processes, and look and feel of Point C and its user interface.

76.     Based on the foregoing substantial similarities and overlap between Point C and CompanionFlex, in addition to CapRelo's extensive access and exposure to Plus's proprietary information and the Trade Secrets, CapRelo misappropriated the Trade Secrets and violated the NDA by using the Trade Secrets, comprising features of Plus's Point C platform, software, algorithm, and APIs that reveal aspects of the proprietary credit methodology process and algorithm, and incorporating them into CapRelo's CompanionFlex software, including but not limited to Plus's features for:

a)      Implementation of a credit-based relocation platform, where benefits are selected and created by users, as opposed to, for example, utilizing a restrictive pre-determined relocation policy with benefit explanations, where Plus's proprietary algorithm enables a credit-expenditure for the selected benefits based on its proprietary pricing;

b)      Elimination of exceptions previously unavailable to relocating employees under traditional relocation benefits policies, via Plus's proprietary pricing and algorithm;

c)      Enablement of relocating employees to have choice and control while designing their own highly personalized and customizable relocation package as opposed to adhering to a strict policy of benefits, which is premised off of Plus's proprietary pricing and credit translation algorithm;

d) Dedicated administration site with the ability to report benefit selections and utilization for overall program analysis that is enabled via Plus's algorithm— in addition to the aspects referenced above, the algorithm further offers unique data to employers concerning their relocating employees' benefits selections, timing of the employees' benefits selections, benefits offered to relocating employees, thereof, and overall status and/or maintenance of employees' moves;

e) Allowance of automated benefits population, consisting of traditional, non-traditional, and hybrid benefits; and

f) Reduction of relocation managers and consultants workloads due to the shift in service delivery approach;

77. Upon information and belief, CapRelo launched CompanionFlex after its access to Plus's confidential information and trade secrets obtained exclusively under the NDA.

78. In the CompanionFlex Article, CapRelo claims that "one CompanionFlex client [(i.e., Walmart)] surpassed $6.5 million last year reducing exceptions alone by $85,000." (Ex. B.) CapRelo's claim aligns with the timeline in which both Walmart was actively using Point C and CapRelo had not yet released CompanionFlex. Thus, CapRelo's claim concerns Walmart's use of Point C for its benefits selection services, not the non-existent CompanionFlex.

## VII. Walmart's Partial Termination and Breach of the SaaS Agreement Caused by CapRelo's Misappropriation and Other Actions

79. Not coincidentally, Walmart provided to Plus a notice of its intent to terminate Plus's domestic relocation benefits services rendered under the SaaS Agreement just three months after the publication of the CompanionFlex Article.

80. Walmart explained that its termination of that portion of the SaaS Agreement was a result of its desire to switch to a CapRelo platform similar to Point C (i.e., CompanionFlex).

81. Although Walmart terminated Plus's services for its relocating employees serviced by CapRelo that became effective June 5, 2023, Walmart did not terminate the use of Point C for their population of employees serviced by its other RMCs', excluding CapRelo, coreflex programs. Walmart is still actively using Point C for this subset of relocating employees.

82. Given Walmart's sudden termination of the SaaS Agreement and substitution of CompanionFlex for Point C as its preferred relocation benefits software, Plus sought reasonable assurances from CapRelo to ensure that CapRelo was not utilizing any of Plus's confidential information or Trade Secrets provided to it under the NDA.

83. Paragraph 1.b(ii) entitled "Use of SaaS" asserts that "Walmart is responsible for assuring Affiliates and Walmart Contractors [(i.e., CapRelo)] comply with the terms and conditions in this Agreement," which necessarily includes the confidentiality obligations imposed by Paragraph 8 of the SaaS Agreement. (Ex. B, ¶ 1.b(ii).)

84.     CapRelo was aware of the SaaS Agreement and the provisions contained therein, including, but not limited to Paragraph 1.b(ii).

85.     CapRelo failed to provide Plus with any assurances that it was not utilizing Plus's confidential information and Trade Secrets, resulting in Plus being forced to file this Complaint in order to protect its valuable intellectual property, trade secrets, and proprietary confidential information.

## COUNT 1

### Misappropriation of Trade Secrets under 18 U.S.C. § 1836(b)

86.     Plus realleges and incorporates by reference as if fully set forth herein Paragraphs 1 through 85.

87.     As set forth above, Plus is the exclusive owner of all right, title, and interest in and to the Trade Secrets, and CapRelo has misappropriated and used Plus's Trade Secrets.

88.     The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from disclosure or use of the Trade Secrets.

89.     The independent economic value of the Trade Secrets is further supported by Plus's investment of time, resources, and money into the research and development of Point C, as well as the lack of any other similar software on the market—excluding the misappropriating CompanionFlex software.

90.     Plus has, at all relevant times, taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of the Trade Secrets, including

requiring non-disclosure agreements and confidentiality obligations as evidenced by the NDA and SaaS Agreement. In addition to Plus's requirement of NDAs and confidentiality obligations on third parties, Plus further imposes security systems and confidentiality obligations on its employees and requires annual trainings concerning employees' treatment of Plus's confidential information and trade secrets.

91.     Furthermore, access to Plus's proprietary software and algorithm supporting the software, such as those involved with Point C, is limited to a subset of Plus employees and contractors under similar confidentiality restrictions. Plus employs a multi-layer administrative system that guards against unauthorized access to proprietary Point C materials. This system requires security credentials and high administrator approval before any individual is granted access to Point C and materials concerning it.

92.     Plus's Trade Secrets were sufficiently secret and maintained so that only those people necessary, and subject to an NDA and/or confidentiality obligation, were made privy to each and every component of the Trade Secrets and their collective use.

93.     Plus's Trade Secrets were further limited so that any corporation, individual, or other entity doing business or otherwise working with Plus was required to sign an NDA prior to divulging the Trade Secrets or any portion thereof.

94.     Subject to an NDA, CapRelo received access to and used the Trade Secrets and the documents supporting them, such as technical documents, underlying system architectures, interfaces, components, algorithm, source code, APIs containing the proprietary credit methodology, specifications, and internal presentations explaining the operability and functionality of Point C.

95. In addition to the documents provided to CapRelo, CapRelo also received test accounts to access both the administrative user interface and the relocating employee user interface to fully understand the benefits selection process within Point C. This access allowed CapRelo to see firsthand how the Point C system worked on both the front-end and the back-end.

96. CapRelo was fully aware that the information comprising the Trade Secrets was secret, confidential, and maintained in such a way as to prevent disclosure to third parties, including current and future competitors of Plus.

97. CompanionFlex both mirrors Point C's features as described above and was released after CapRelo's access to the Point C materials.

98. In addition to mirroring the Point C features, CompanionFlex further utilizes an API architecture akin to Point C's unique API.

99. Having access to Point C's API provided CapRelo with the information necessary to build out a similar product having similar features to Point C and obtain a competitive advantage over others in the relocation benefit services sector.

100. By virtue of its use of the Trade Secrets, CapRelo obtained a further competitive advantage over others in the relocation benefit services sector by way of having the benefit of the research Point C invested in.

101. CapRelo violated the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, by unlawfully using the Trade Secrets obtained subject to the NDA to develop and offer to consumers CompanionFlex to the detriment of Plus.

102. CapRelo was aware of its obligations under the NDA and still misappropriated the Trade Secrets to develop CompanionFlex in direct competition with Plus.

103. CapRelo's misappropriation of the Trade Secrets was willful and malicious.

104. CapRelo's use of Plus's confidential information and Trade Secrets in developing CompanionFlex has irreparably harmed Plus, entitling Plus to injunctive relief.

105. As a result of and caused by CapRelo's misappropriation of the Trade Secrets, Plus has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation, among other damages, in an amount to be proven at trial.

## COUNT 2

### Misappropriation of Trade Secrets under Minn. Stat. ch. 325C

106. Plus realleges and incorporates by reference as if fully set forth herein Paragraphs 1 through 105.

107. As set forth above, CapRelo has misappropriated and used Plus's Trade Secrets.

108. The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from disclosure or use of the Trade Secrets.

109. The independent economic value of the Trade Secrets is further supported by Plus's investment of time, resources, and money into the research and development of Point

C, as well as the lack of any other similar software on the market—excluding the misappropriating CompanionFlex software.

110. Plus has, at all relevant times, taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of the Trade Secrets.

111. Plus's Trade Secrets were sufficiently secret and maintained so that only those necessary, subject to an NDA, were made privy to each and every component of the Trade Secrets and their collective uses. In addition to Plus's requirement of NDAs and confidentiality obligations on third parties, Plus further imposes confidentiality obligations on its employees and requires annual trainings concerning employees' treatment of Plus's confidential information and trade secrets.

112. Furthermore, access to Plus's proprietary software and algorithm supporting the software, such as those involved with Point C, is limited to a subset of Plus employees and contractors under similar confidentiality restrictions. Plus employs a multi-layer administrative system that guards against unauthorized access to proprietary Point C materials. This system requires security credentials and high administrator approval before any individual is granted access to Point C and materials concerning it.

113. Plus's Trade Secrets were further limited so that any corporation, individual, or other entity doing business or otherwise working with Plus was required to sign an NDA prior to divulging the Trade Secrets or any portion thereof.

114. Subject to an NDA, CapRelo received access to and used the Trade Secrets and the documents supporting them, such as, technical documents, underlying system architectures, interfaces, components, algorithm, source code, APIs containing the

proprietary credit methodology, specifications, and internal presentations explaining the operability and functionality of Point C.

115.    CapRelo was fully aware that the information comprising the Trade Secrets was secret, confidential, and maintained in such a way as to prevent disclosure to third parties, including current and future competitors of Plus.

116.    CompanionFlex both mirrors Point C's features as prescribed above and was released after CapRelo's access to the Point C materials.

117.    In addition to mirroring the Point C features, CompanionFlex further utilizes an API architecture akin to Point C's unique API.

118.    Having access to Point C's API provided CapRelo with the information necessary to build out a similar product having similar features to Point C and obtain a competitive advantage over others in the relocation benefit services sector.

119.    By virtue of its use of the Trade Secrets, CapRelo obtained a further competitive advantage over others in the relocation benefit services sector by way of having the benefit of the research Point C invested in.

120.    CapRelo violated Minn. Stat. ch. 325C by unlawfully using the Trade Secrets obtained through the NDA to develop and offer to consumers CompanionFlex to the detriment of Plus.

121.    CapRelo was aware of its obligations under the NDA and still misappropriated the Trade Secrets to develop CompanionFlex in direct competition with Plus's Point C platform and software.

122.    CapRelo's misappropriation of the Trade Secrets was willful and malicious.

26

123.    CapRelo's use of Plus's confidential information and Trade Secrets in developing CompanionFlex has irreparably harmed Plus, entitling Plus to injunctive relief.

124.    As a result of and caused by CapRelo's misappropriation of the Trade Secrets, Plus has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation, among other damages, in an amount to be proven at trial.

## COUNT 3

### Breach of Contract

125.    Plus realleges and incorporates by reference as if fully set forth herein Paragraphs 1 through 124.

126.    On or about March 31, 2021, Plus and CapRelo entered into and executed the NDA. (*See* Ex. A.)

127.    Plus performed all of its obligations under the NDA.

128.    CapRelo breached the NDA by unlawfully using the Trade Secrets obtained through the NDA to develop and offer CompanionFlex to consumers, including Walmart, in direct breach of CapRelo's obligations under the NDA and to the detriment of Plus.

129.    Through execution of the NDA, CapRelo expressly agreed that "monetary damages may be inadequate to compensate Disclosing Party for any breach by Receiving Party of this Agreement." (*See id.* ¶ 7.)

130.    Through the execution of the NDA, CapRelo further agreed and acknowledged:

"[A]ny a (*sic*) breach . . . of this Agreement may cause irreparable injury to

27

Disclosing Party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, Disclosing Party shall be entitled to seek injunctive relief against the continuation of the breach or the threatened breach of this Agreement, without the necessity of posting bond."

(*See id.*)

131.   CapRelo's breach of the NDA and use of Plus's confidential information and Trade Secrets in developing CompanionFlex has irreparably harmed Plus, entitling Plus to injunctive relief.

132.   As a direct and proximate cause of CapRelo's breach of the NDA, Plus has further been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation, among other damages, in an amount to be proven at trial.

## COUNT 4

### Breach of Covenant of Good Faith and Fair Dealing

133.   Plus realleges and incorporates by reference as if fully set forth herein Paragraphs 1 through 132.

134.   In addition to its breach of the express terms of the NDA, CapRelo breached the implied covenant of good faith and fair dealing by unjustifiably hindering Plus's performance under the NDA and related SaaS Agreement.

135.   One express purpose of the NDA was for CapRelo and Plus "to explor[e] potential business relationships" (Ex. A, Preamble.)

136.    Under the NDA, CapRelo and Plus agreed "that the Confidential Information is and shall remain the property of [Plus] and all right, title and interest in and to the Confidential Information shall be and remain vested in [Plus]. (*Id.*, ¶ 2.)

137.    CapRelo breached the implied covenant of good faith and fair dealing by acting in bad faith—that is, CapRelo intentionally refused to fulfill its contractual obligation under the NDA based on an ulterior motive of developing CompanionFlex and offering it to Walmart.

138.    CapRelo intentionally and in bad faith breached the implied covenant of good faith and fair dealing by unjustifiably hindering Plus's ability to retain right, title, and interest of the Confidential Information (e.g., the Trade Secrets).

139.    CapRelo intentionally and in bad faith breached the implied covenant of good faith and fair dealing by unjustifiably hindering Plus's ability to fulfill the purpose of the contract.

140.    As a direct and proximate cause of CapRelo's breach of the implied covenant of good faith and fair dealing, Plus has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationships, and lost reputation in an amount to be proven at trial.

## COUNT 5

### Tortious Interference with Contract

141.    Plus realleges and incorporates by reference as if fully set forth herein Paragraphs 1 through 140.

142.    In or about June 2021, Plus and Walmart entered into the SaaS Agreement, under which Plus would provide Walmart with Plus's Point C platform and software. (*See* Ex. B.)

143.    Paragraph 1.b(ii) entitled "Use of SaaS" asserts that "Walmart is responsible for assuring Affiliates and Walmart Contractors [(i.e., CapRelo)] comply with the terms and conditions in this Agreement," which necessarily includes the confidentiality obligations imposed by Paragraph 8 of the SaaS Agreement. (Ex. B, ¶ 1.b(ii).)

144.    CapRelo was aware of the SaaS Agreement and the provisions contained therein, including, but not limited to Paragraph 1.b(ii).

145.    Under the SaaS Agreement, and pursuant to the NDA, CapRelo received access to Plus's Point C platform and software, including the Trade Secrets, so that CapRelo could integrate Plus's Point C platform and software into Walmart's relocation program and CapRelo's move management technology.

146.    As part of its role in integrating Point C into Walmart's internal benefits program, CapRelo representatives received confidential and proprietary information pertaining to the technical architecture and inner workings of Point C. CapRelo was further provided with administrative credentials to facilitate and manage the integration of Point C with Walmart's previously existing program and CapRelo's move management technology, per Walmart's request.

147.    All of this confidential and proprietary information was provided while the NDA was effective and was further governed by the NDA. (*See* Ex. A, ¶¶ 2, 6.)

148.    Among CapRelo's Representatives with access to the Trade Secrets was Ms. Kazery.

149.    Ms. Kazery had extensive access to the inner workings of Point C during her time at both CapRelo and Walmart, which included technical documents, underlying system architectures, interfaces, components, API specifications, and internal presentations explaining the operability and functionality of Point C, such as Point C's innovative exception-eliminating platform and credit-based benefits selection system.

150.    Ms. Kazery left CapRelo at some point in November 2021 and accepted a role with Walmart in Walmart's global business services division, where she assisted with the relocation of Walmart associates and personnel.

151.    Ms. Kazery's obligations under the NDA continue in perpetuity even upon leaving her position at CapRelo.

152.    On May 5, 2023, Walmart notified Plus that Walmart would be terminating the domestic services under the SaaS Agreement effective June 5, 2023.

153.    Walmart explained that its partial termination of the SaaS Agreement was a result of its desire to switch to a CapRelo platform similar to Point C (i.e., CompanionFlex).

154.    CapRelo intentionally and purposefully developed CompanionFlex by misappropriating the Trade Secrets provided to it by Plus, subject to the NDA.

155.    CapRelo developed CompanionFlex to induce Walmart to terminate the domestic services of the SaaS Agreement with Plus and replace those services with CompanionFlex.

156.    CapRelo's use and misappropriation of Plus's Trade Secrets and Confidential Information resulted in Walmart's breach of at least Paragraph 1.b(ii) of the SaaS Agreement.

157.    There exists no justification for CapRelo's intentional interference with the SaaS Agreement.

158.    As a direct and proximate result of CapRelo's conduct, Plus has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationship, and lost reputation, among other damages, in an amount to be proven at trial.

## COUNT 6

### Tortious Interference with Business Opportunity

159.    Plus realleges and incorporates by reference as if fully set forth herein Paragraphs 1 through 151.

160.    In or about June 2021, Plus and Walmart entered into the SaaS Agreement, under which Plus would provide Walmart with Plus's Point C platform and software.

161.    CapRelo was aware of the SaaS Agreement.

162.    Under the SaaS Agreement, and pursuant to the NDA, CapRelo received access to Plus's Point C platform and software, including the Trade Secrets, so that CapRelo could integrate Plus's Point C platform and software into Walmart's existing relocation program and CapRelo's move management system.

163.    As part of its role in integrating Point C into Walmart's internal benefits program, CapRelo representatives received confidential and proprietary information pertaining to the technical architecture and inner workings of Point C. CapRelo was further

provided with administrative credentials to facilitate and manage the integration of Point C with Walmart's previously existing program and CapRelo's move management technology, per Walmart's request.

164.   All of this confidential and proprietary information was provided while the NDA was effective and was further governed by the NDA. (*See* Ex. A, ¶¶ 2, 6.)

165.   Among CapRelo's Representatives with access to the Trade Secrets was Ms. Kazery.

166.   Ms. Kazery had access to the inner-workings of Point C during her time at both CapRelo and Walmart, which included technical documents, underlying system architectures, interfaces, components, API specifications, and internal presentations explaining the operability and functionality of Point C, such as Point C's innovative exceptions platform and credit-based system.

167.   Upon information and belief, Ms. Kazery left CapRelo at some point in November 2021 and accepted a role with Walmart in Walmart's global business services division, where she assisted with the relocation of Walmart associates and personnel.

168.   Ms. Kazery's obligations under the NDA continue in perpetuity even upon leaving her position at CapRelo.

169.   On May 5, 2023, Walmart notified Plus that Walmart would be terminating the domestic services under the SaaS Agreement effective June 5, 2023.

170.   Walmart explained that its partial termination of the SaaS Agreement was a result of its desire to switch to a CapRelo platform similar to Point C (i.e., CompanionFlex).

171.     Plus reasonably expected that Walmart would have continued to use Plus's Point C platform and software for its domestic employee relocation needs, because Plus's Point C was the only on the market that could facilitate Walmart's needs.

172.     CapRelo knew that, but for CapRelo's unlawful conduct, Walmart would have continued to use Plus's Point C platform and software for its domestic employee relocation needs.

173.     CapRelo intentionally engaged in unlawful conduct, including violations of 18 U.S.C. § 1836(b), Minn. Stat. ch. 325C, and Minn. Stat. ch. 325D, to interfere with Plus's reasonable expectation of business opportunity and economic advantage related to Walmart's use of Plus's Point C platform and software.

174.     Additionally, CapRelo published the CompanionFlex Article in which, upon information and belief, it references the successes of Plus's Point C platform and software as its own. (*See* Ex. B.)

175.     Upon information and belief, but for CapRelo's unlawful conduct, Walmart would have continued to use Plus's Point C platform and software for its domestic employee relocation needs.

176.     As a direct and proximate result of CapRelo's conduct, Plus has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationship, and lost reputation, among other damages, in an amount to be proven at trial.

## COUNT 7

**Deceptive Trade Practices under Minn. Stat. § 325D.43,** *et. seq.*

177.   Plus realleges and incorporates by reference as if fully set forth herein Paragraphs 1 through 169.

178.   On or about February 21, 2023, CapRelo released the CompanionFlex Article claiming that it "built a platform to help their clients and transferees make relocating a seamless experience" and that its platform "is cutting edge, and is exciting to see the features that help each transferee personalize their own." (Ex. B.)

179.   The CompanionFlex Article further claims that "one CompanionFlex client surpassed $6.5 million last year, reducing exceptions alone by $85,000." (*Id.*)

180.   Upon information and belief, the "client" referenced in the CompanionFlex Article is Walmart.

181.   Upon information and belief, as of the February 21, 2023 release of the CompanionFlex Article, Walmart had not implemented CapRelo's CompanionFlex platform and software.

182.   Upon information and belief, CapRelo's assertions in its CompanionFlex Article refer to the standard, quality, grade, style, qualities, benefits, and achieved results of Point C.

183.   CapRelo's conduct constitutes deceptive trade practices in violation of, at least, Minn. Stat. § 325D.44(1), (2), (5), (7), (8), and (13). CapRelo's conduct:

a)      passes off Plus's Point C's results as its own;

35

b) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Parties' respective platforms and software;

c) represents that CompanionFlex has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that it does not have or that CapRelo has a sponsorship, approval, status, affiliation, or connection that CapRelo does not have;

d) represents that CompanionFlex is of a particular standard, quality, or grade, and that CompanionFlex is of a particular style or model, while actually being that of Plus's Point C;

e) disparages Plus and Point C by false or misleading representation of fact; and

f) creates a general likelihood of confusion or of misunderstanding as to CompanionFlex and Plus's Point C.

184. As a direct and proximate result of CapRelo's conduct, Plus has been damaged economically by way of lost profits, lost trade secrets, lost prospective business relationship, and lost reputation, necessitating injunctive relief to prevent further damage to both Plus and its Point C product.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Plus One, LLC respectfully requests that this Court:

i. enter a judgment, in favor of Plus, holding that CapRelo misappropriated Plus's trade secrets, breached the parties' NDA, breached the covenant of good faith and fair dealing, tortuously interfered with a previously existing

36

contract relationship between Plus and Walmart, tortuously interfered with prospective contracts between Plus and Walmart, and violated Minn. Stat. § 325D.44;

ii.  grant a permanent injunction prohibiting CapRelo from further acts of misappropriation and use of Plus's confidential and proprietary information pertaining to its Point C platform and software;

iii.  enter a judgment and order requiring CapRelo to pay Plus its damages, enhanced damages, costs, expenses, pre-judgment and post-judgment interest, and attorneys' fees for Plus's misappropriation, breach, and unfair competition;

iv.  enter a judgment and order finding CapRelo willfully misappropriated Plus's trade secrets, that Plus is the prevailing party, and award Plus its reasonable attorneys' fees, including but not limited to pursuant to the NDA § 9 and Minn Stat. ch. 325C.04; and

v.  grant any and all other relief as the Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b) and LR 38.1, Plaintiff Plus One, LLC hereby demands a jury trial for all issues that are so triable.

Dated: September 20, 2023

Respectfully submitted,

**BALLARD SPAHR LLP**

*/s/ Jonathon A. Talcott*
Jonathon A. Talcott (MN #0391457)
talcottJ@ballardspahr.com
Conor H.M. Smith (MN #0401445)
smithchm@ballardspahr.com
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612.371.3211
Facsimile: 612.371.3207

Kyle A. Ceuninck (*pro hac vice*)
ceuninckk@ballardspahr.com
999 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: 678.420.9330
Facsimile: 678.420.9301

*Attorneys for Plaintiff, Plus One, LLC*

# EXHIBIT
# A

DocuSign Envelope ID: 4B4CA866-5052-4B54-B382-A9835457D710

# NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement (the "**Agreement**") is entered into as of ___3/31/2021___, ("**Effective Date**") by Plus One, LLC, a Minnesota limited liability company ("**Plus**"), and Capital Relocation Services, LLC ("**Company**"). Each party to this Agreement may also be referred to herein individually as a "Party" and collectively as the "Parties."

The Parties desire to exploring potential business relationships, under which Company desires to review certain Plus software and technology related to Plus services (the "**Discussions**"). In furtherance of the Discussions, Plus ("**Disclosing Party**") may disclose to Company ("**Receiving Party**"), or Receiving Party may have access to, certain Confidential Information (as defined below) of the other Party. As a condition to being furnished Confidential Information, Receiving Party and its respective directors, officers, employees, affiliates, agents and advisors (collectively, "**Representatives**") agree to treat Disclosing Party's Confidential Information in accordance with the provisions of this Agreement.

The Parties hereby agree as follows:

1.  <u>**Confidential Information**</u>.

    (a)  "**Confidential Information**" means any and all (i) intellectual property protectable by patent rights, copyrights, trademark rights, rights in trade secrets (if any), design rights, database rights, domain name rights, moral rights, and any other intellectual property rights (registered or unregistered) throughout the world, (ii) information or material regarding products, services, business processes, business plans, financial information, personnel of either party and other related information that is provided to either party, including all original documents and any derivatives, portions, or copies thereof, whether in oral, written, visual, graphic, electronic, machine recognizable, or other form or medium, each as provided by Disclosing Party as part of the Discussions. Both Parties will make all reasonable efforts to ensure that the Confidential Information is clearly identified and marked; provided, however, that the obligation to protect Confidential Information shall extend to unmarked data known by the parties to be confidential that may be disclosed orally or otherwise.

    (b)  Confidential Information shall not include any information which (i) can be shown by either Party to be known to it prior to this Agreement; (ii) was already in the public domain and generally available to the public; (iii) properly came into the possession of Receiving Party from a third party that is not known by Receiving Party to be under any obligation to maintain the confidentiality thereof to Disclosing Party; or (iv) Receiving Party can demonstrate, with documentary evidence was independently developed by or for Receiving Party without the use of Disclosing Party's Confidential Information.

2.  <u>**Ownership and Return of Confidential Information.**</u> Each Party agrees that the Confidential Information is and shall remain the property of Disclosing Party and all right, title and interest in and to the Confidential Information shall be and remain vested in Disclosing Party. Nothing in this Agreement shall be construed to grant to Receiving Party any license or other rights in or to Disclosing Party's Confidential Information. Confidential Information and all copies thereof, in any tangible form or media (including but not limited to any reports, memoranda or other materials prepared by or at the discretion of Receiving Party), shall be, upon expiration of this Agreement or sooner at Disclosing Party's request ( as soon as commercially practicable following Disclosing Party's request), returned to Disclosing Party or, if specified by Disclosing Party, destroyed. Furthermore, Receiving Party agrees to permanently erase or delete any Confidential Information stored electronically, magnetically or otherwise on machines or devices, and to physically destroy any Confidential Information stored by other means, immediately upon request by Disclosing Party; provided, however, that the Parties may retain one copy of the Confidential Information if required by the Parties' document retention policy or as otherwise required by applicable law. Upon the request of Disclosing Party, Receiving Party shall certify in writing that it has complied with these requirements.

3.  <u>**No Representations or Warranties.**</u> All Confidential Information is provided on as "AS IS" basis. Each Party acknowledges the other Party makes no express or implied representations or warranties and shall have no liability with respect to the reliability, accuracy or completeness of the information contained in the Confidential Information. **THE PARTIES AGREE THAT ALL EXPRESS OR IMPLIED REPRESENTATIONS AND WARRANTIES RELATING TO CONFIDENTIAL INFORMATION ARE HEREBY DISCLAIMED, INCLUDING (WITHOUT LIMITATION) THE WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE,**

**MERCHANTABILITY, AND NON-INFRINGEMENT.** Nothing in this Agreement shall create any obligation on the part of either party to enter into any other agreement or business relationship with the other party.

**4.** **Receiving Party's Obligations.** Receiving Party agrees that it shall use Disclosing Party's Confidential Information solely for the Discussions  Receiving Party shall maintain the confidentiality of Disclosing Party's Confidential Information with at least the same degree of care that it uses to protect its own Confidential Information, but in any event shall use at least commercially reasonable measures to protect the confidentiality of and avoid disclosure of Disclosing Party's Confidential Information. Receiving Party further agrees that Disclosing Party's Confidential Information shall be kept confidential and Receiving Party agrees it shall not disclose any of Disclosing Party's Confidential Information to employees or to third parties; *provided, however*, that any Confidential Information may be disclosed to Receiving Party's Representatives who need to know the Confidential Information for the Discussions and have been informed by the Receiving Party of this Agreement and the obligations of such Representative to protect Disclosing Party's Confidential Information hereunder.. Receiving Party also agrees to only make copies of Confidential Information as are necessary to evaluate the Discussions. Receiving Party shall promptly notify Disclosing Party in the event of any unauthorized use or disclosure of Disclosing Party's Confidential Information.

**5.** **Legally Requested or Ordered Disclosures.** If Receiving Party is served with a request to disclose all or any part of the Confidential Information under the terms of a subpoena, order issued by a court or by a governmental body with applicable jurisdiction, or other legal process requiring the production of Confidential Information, Receiving Party shall (a) promptly notify Disclosing Party of the existence, terms, and circumstances surrounding the request, if notification is permitted, (b) subject to the foregoing, consult with Disclosing Party on the advisability of taking legal available steps to resist or narrow the request and (c) reasonably cooperate with Disclosing Party's efforts to obtain a protective order to prevent the disclosure of the Confidential Information.

**6.** **Term.** This Agreement shall commence as of the Effective Date and shall expire five years thereafter unless terminated earlier in accordance with this Section. Either Party may terminate this Agreement prior to its expiration upon 30 days' prior written notice to the other Party. Notwithstanding the expiration or termination of this Agreement, Receiving Party's obligations, and Disclosing Party's rights, hereunder with respect to any Confidential Information shall continue for three years from the expiration or termination date of this Agreement, unless otherwise required by applicable law. Notwithstanding the foregoing, with respect to Confidential Information disclosed to Receiving Party that is held by Disclosing Party as a trade secret, Receiving Party's obligations, and Disclosing Party's rights, hereunder shall continue as long as that Confidential Information remains a trade secret.

**7.** **Injunctive Relief.** Receiving Party agrees that its obligations hereunder are necessary and reasonable in order to protect Disclosing Party and Disclosing Party's business, and expressly agrees that monetary damages may be inadequate to compensate Disclosing Party for any breach by Receiving Party of this Agreement. Accordingly, Receiving Party agrees and acknowledges that any a breach or threatened breach of this Agreement may cause irreparable injury to Disclosing Party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, Disclosing Party shall be entitled to seek injunctive relief against the continuation of the breach or the threatened breach of this Agreement, without the necessity of posting bond.

**8.** **Governing Law, Jurisdiction.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, excluding its choice of law rules. Any action arising out of, relating to or in connection with this Agreement must be brought in a state or federal court sitting in Minneapolis, Minnesota, and each of the Parties irrevocably submits to the exclusive jurisdiction of the applicable court in any action or proceeding and waives any objection it may now have or hereafter have to venue or convenience of forum.

**9.** **Attorney Fees.** The prevailing Party, as determined by the court in any action between the Parties arising from this Agreement, shall be entitled to recover, in addition to any other relief awarded, its costs and expenses incurred in the applicable proceeding, including, without limitation, its reasonable fees for attorneys, expert witnesses and court costs. Should any provision of this Agreement be determined to be void, invalid or otherwise unenforceable by any court of competent jurisdiction, that determination shall not affect the remaining provisions hereof which shall remain in full force and effect.

**10.** **No Assignment.** Neither Party may assign this Agreement without the express written consent of the other Party, and any prohibited assignment shall be void.

11.    **Miscellaneous.** This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous negotiations, discussions and understandings of the Parties, whether written or oral. No waiver or modification of any of the provisions of this Agreement shall be valid unless in writing and signed by both Parties. The failure to enforce at any time any of the provisions of this Agreement or to require at any time performance by any Party of any of the provisions hereof shall in no way be construed to be a waiver of those provisions or to affect the validity of this Agreement, or any part hereof, or the right of any Party thereafter to enforce those provisions in accordance with the terms of this Agreement. Both Parties acknowledge and agree that the disclosure of Confidential Information to each other does not constitute or infer any future or binding arrangement to conduct business or work together. Notwithstanding any provision in this Agreement to the contrary, the Parties agree that this Agreement shall be interpreted without giving effect to any principle of construction that would otherwise require this Agreement to be construed against a Party that drafted it solely because that Party drafted this Agreement. Any notice under this Agreement shall be in writing and shall be deemed to have been duly given when delivered personally or by email to the email address shown on the signature page to this Agreement, or three days after the notice is deposited in the United States mail, registered, postage prepaid, and addressed to the Party at its address shown on the signature page to this Agreement.

**Each of the Parties has executed this Agreement by its authorized representative as of the Effective Date.**

**COMPANY**

By: _Heather Hudnall_
    5042E8C188884B8...

Print Name: Heather Hudnall

Title: VP Client Services

Mailing Address: CapRelo
                 108 Carpenter Dr
                 Sterling, VA 20164

Email Address: Heather.Hudnall@caprelo.com

**PLUS ONE, LLC**

By: _Susan Benevides_
    2B88CD61959A40A...

Print Name: Susan Benevides

Title: CEO

Mailing Address:
  600 Highway 169 South, Suite 500
  Minneapolis, MN 55426

Email Address: notices@plusoneinnovates.com

# EXHIBIT

# B

CASE 0:25-mc-00003-JRD-JFD Doc. 1-2 Filed 11/07/24 Page 86 of 105





CONTACT US

**TECHNOLOGY**      2023 February 21

# CompanionFlex: The Key to Delivering Flexibility and Affordability

By Heather Hudnall, CRP, GMS



Employees have spoken: they expect flexibility in how and where they work and flexibility in the relocation benefits that support their unique lifestyle needs.

In study after study, that message has been delivered loud and clear. In our own research of 188 HR professionals, we found that the companies that embrace employees' expectations for flexibility garner the highest employee satisfaction. To recruit and retain the talent needed to ramp global operations post-COVID, HR mobility leaders must put flexibility first.

## Answering the Imperative for Flexibility

Think of it as the imperative for flexibility. One that is causing HR leaders to adapt their mobility programs to better support the needs of a diverse workforce. Increasingly, businesses are turning to core/flex programs that combine standard benefits with flexible ones customized to each employee's needs. While the upshot of core/flex is baked-in flexibility, it also is a no-brainer way to embed DEI&B into organizational culture.

That said, managing the delivery of an a la carte menu of options for multiple transferees can add complexity to the HR team's job. Take, for instance, senior director Marie. As a single mom with young children who plans to rent while on a short-term assignment to the West Coast, her relocation support needs are much different needs than those of software engineer Marcus. Her priorities are local rental assistance to guide her to safe, family-friendly neighborhoods, a trusted household goods mover, and assistance in school and after-school enrollment.

When Marcus moves cross-continent with his partner and service dog, he will appreciate white glove move assistance, and a fully stocked and furnished accessible home awaiting their arrival. Multiply these scenarios by dozens of transferring employees in a busy mobility organization. To manage the coordination of such unique sets of benefits on a case-by-case basis, using letters of understanding or perhaps a one-pager checklist of services, can quickly become untenable for the HR team. That's where CompanionFlex steps in.

## What is CompanionFlex?

CompanionFlex transforms the way your mobility team manages employee relocation benefit choices. Instead of manually managing each transferee's benefits selections, the mobility manager assigns core benefits for relocating employees in CompanionFlex, ensuring they are meeting their duty of care, while also allowing the employee to choose the rest of their benefits.

In the CompanionFlex platform, the employee can view all available benefits options they've been assigned and choose what they want to use. Employees gain control of their relocation program, while the mobility manager controls relocation budgets and reduces manual processing.

In CompanionFlex, the mobility manager will find an extensive library of more than 100 employee benefit options, both traditional and non-traditional. The HR team chooses those it wishes to make available to relocating employees. Want to add a service not listed? No problem. The administrative interface is –no surprise — flexible to your needs, too!

## Employee Control – with HR Budgetary Control

While flexible benefits may answer employees' rallying cry, they also must meet the HR manager's budgetary limitations. The fact is that in today's more costly operating environment, flexible relocation programs are only sustainable if they are affordable. CompanionFlex, CapRelo's core-flex platform, puts the HR decision-maker in the driver's seat when it comes to controlling costs.

CompanionFlex enables the HR mobility manager to configure virtually every aspect of the benefits its employees will have access to. Program benefits can be configured by employee level (for example, vice presidents might get more options than directors) or by transferee levels. Working with the CapRelo consultant, HR can then customize which benefits are core and which are flex by level, and the value of each benefit offered, either in dollars or points. You can even limit the number of times a benefit may be used – for instance, only one carpet cleaning service or two grocery gift cards. As the employee "shops" benefits within the

portal, they can add favorites to their wish list to review later or add items directly to their cart and purchase them immediately.

When ready to check out, the transferee sees in real-time the amount spent from their virtual wallet and the remaining available budget for their move. Should they need help, CompanionFlex will suggest recommendations based on whether they are a renter or homeowner – or the employee can use the interactive calendar to schedule a meeting with their relocation consultant.

All that, with zero hands-on intervention by the HR team. CompanionFlex enables mobility managers to deliver what transferees want, more efficiently and cost-effectively. Integrated data analytics tools provide continual insights into how employees are using the platform. Through the administrative dashboard, the HR manager can see which benefits are being used, which are most popular, how long it takes transferees to select a benefit, and how often employees are leaving points or cash unused. Pulse checks with transferees give the mobility team feedback into how users feel about the experience as they go and throughout the move.

## CompanionFlex a Win-Win for Global Mobility

More than ever, global mobility leaders are being tasked with incorporating flexible relocation benefits while keeping mobility budgets within goal. The savings for one CompanionFlex client surpassed $6.5 million last year, reducing exceptions alone by $85,000.

As our largest retail client recently conveyed, "Relocation needs are different for each individual, and CapRelo has built a platform to help their clients and transferees make relocating a seamless experience. The tool is cutting edge, and it is exciting to see the features that help each transferee personalize their own relocation. It is meeting all of our program's needs."

The imperative for flexibility in global mobility programs is here. If your mobility team is looking for innovative ways to wow transferees with flexible, yet affordable, relocation program benefits, talk to the CapRelo team about CompanionFlex.  We

can help you create a customized core/flex program and user platform that lets employees shop online and choose from more than 100 benefits, using their CompanionFlex virtual wallet to fund the benefits they want. Learn more.



**MOBILE-ACCESSIBLE, FLEXIBLE.**

## Companion: Your customizable global mobility tech solution.

**See It In Action** ▸

6/27/23, 8:42 AM
CASE 0:25-mc-00063-JRD Doc. 1-260 Filed 11/03/24 Page 94 of 105
CompanionFlex: the key to delivering flexibility and...



Global Headquarters: +1-833-227-7356

**View all locations** ▸





Contact Us      Careers at CapRelo

   

© 2023 All Rights Reserved     Privacy Policy     EU Privacy Policy

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 08224636
Filing Number: 2312186627876
Filing Date/Time: 12/18/2023 03:29 PM
Effective Date/Time: 12/18/2023 03:29 PM

## Stock Corporation - Annual Report

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | Information Technology Management Services Inc. | Entity Type: | Stock Corporation |
| Entity ID: | 08224636 | Formation Date: | 09/08/2017 |
| Jurisdiction: | VA | | |
| Status: | Pending Inactive | | |
| Total Shares: | 25000 | | |

### Registered Agent Information

| | | | |
|---|---|---|---|
| RA Type: | Individual | RA Qualification: | Director of the Corporation |
| Name: | HOAN LE | Registered Office Address: | 12019 ENGLISH MAPLE LN, FAIRFAX, VA, 22030 - 0000, USA |
| Locality: | FAIRFAX COUNTY | | |

### Principal Office Address

Address:    12019 English Maple Ln, Fairfax, VA, 22030 - 6187, USA

### Principal Information

☐ **No Officers:** If the corporation does not have officers because an organizational meeting has not been held.

☐ **No Directors:** If the corporation does not have directors because (i) initial directors were not named in the articles of incorporation and an organizational meeting of the corporation has not been held or (ii) the board of directors has been eliminated by a written agreement signed by all of the shareholders, or by the adoption of provision in the articles of incorporation or bylaws that was approved by all of the shareholders.

| Title | Director | Name | Address |
|---|---|---|---|
| President | No | Hoan Le | 12019, English Maple Lane, Fairfax, VA, 22030, USA |
| | Yes | Hoan Le | 12351 Firestone Court, fairfax, VA, 22033, USA |

### Signature Information

Date Signed: 12/18/2023

| Printed Name | Signature | Title |
|---|---|---|
| Hoan Le | Hoan Le | President |

EXHIBIT
4

EXHIBIT 5



INFORMATION TECHNOLOGY MANAGEMENT SERVICES, INC.

Home | About Us ▾ | Services | Careers | Contact Us | Blog

## Locations

Home > Locations

### Virginia, USA

12019 English Maple ln Fairfax, VA
22030

Home | About Us | Services | Careers | Contact Us | Blog

Our Services

Cloud Services | Infrastructure Services | Managed Services | Consulting Services

Microsoft Partner

Nintex Partner Network

Authorized by SherWeb

© 2024 ITMIS. All rights reserved.

Term of Use | Privacy Policy | Site Map

https://www.itmsinc.com/locations/

11/07/2024

Locations

**EXHIBIT 6**

| | |
|---|---|
| **From:** | Talcott, Jonathon A. |
| **To:** | Hoan Le |
| **Cc:** | Borg-Breen, Caryn; Morgan, Jeffrey; Simler, Benjamin; Blasberg, Erin |
| **Subject:** | RE: Requesting to extend subpoena - case # 0:23-cv-02016-KMM-JFD |
| **Date:** | Friday, October 25, 2024 9:39:01 PM |
| **Attachments:** | ITMS Subpoena_8.29.2024 DMFIRM_413610991(1).PDF |
| **Importance:** | High |

Mr. Le,

I write once again with our final follow up regarding the attached subpoena, which as you know was duly issued to ITMS nearly two months ago on behalf of our client, Plus One, LLC. We require your immediate cooperation with the subpoena, including a complete production in response to the subpoena's requests. Your failure to comply with the subpoena exposes ITMS to the possibility of severe sanctions, including significant monetary penalties.

If you do not comply, we will file a motion to enforce the subpoena and to hold ITMS in contempt of court in the United States Federal District Court for the District of Columbia. To defend itself in these proceedings, ITMS will be required to hire legal counsel to represent it as companies are not permitted to appear in court through non-attorney representatives. We hope to avoid these measures, but you appear to be leaving us no choice.

Please advise us immediately of your intentions.

**Jonathon A. Talcott**



1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
602.798.5485 DIRECT
602.798.5595 FAX

319.210.0887 MOBILE | talcottj@ballardspahr.com

LINKEDIN | VCARD

www.ballardspahr.com

---

**From:** Talcott, Jonathon A.
**Sent:** Monday, October 14, 2024 12:36 PM
**To:** Hoan Le <hoan.le@itmsinc.com>
**Cc:** Borg-Breen, Caryn <borgbreenc@ballardspahr.com>; Morgan, Jeffrey <morganjc@ballardspahr.com>; Simler, Benjamin <simlerb@ballardspahr.com>; Blasberg, Erin <blasberge@ballardspahr.com>
**Subject:** RE: Requesting to extend subpoena - case # 0:23-cv-02016-KMM-JFD

Dear Mr. Le,

I write to follow up on the subject subpoena.  Our understanding from your email is that ITMS intends to fully comply with it, but to date we have not received any documents notwithstanding your representation that you would submit them by October 11.  Please advise as to when we can now expect to receive these documents, and if you need a secure FTP site to transfer them to us.

Best regards,

Jon

**Jonathon A. Talcott**



1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
602.798.5485 DIRECT
602.798.5595 FAX

319.210.0887 MOBILE | talcottj@ballardspahr.com

LINKEDIN | VCARD



www.ballardspahr.com

---

**From:** Talcott, Jonathon A.
**Sent:** Thursday, September 19, 2024 10:49 AM
**To:** Hoan Le <hoan.le@itmsinc.com>
**Cc:** Borg-Breen, Caryn <borgbreenc@ballardspahr.com>; Morgan, Jeffrey <morganjc@ballardspahr.com>; Simler, Benjamin <simlerb@ballardspahr.com>; Blasberg, Erin <blasberge@ballardspahr.com>
**Subject:** RE: Requesting to extend subpoena - case # 0:23-cv-02016-KMM-JFD

Dear Mr. Le,

Thank you for your email and voicemail.  We agree to extending ITMS's deadline to respond to the subpoena to October 11, on the condition that ITMS fully complies with producing the requested documents.  We otherwise reserve all rights on behalf of our client, Plus One, LLC.  If a discussion would be helpful, please let me know a time this afternoon, tomorrow, or Monday that works.

Best regards,

Jon

**Jonathon A. Talcott**



1 East Washington Street, Suite 2300

2

Phoenix, AZ 85004-2555
602.798.5485 DIRECT
602.798.5595 FAX

319.210.0887 MOBILE | talcottj@ballardspahr.com
LINKEDIN | VCARD

www.ballardspahr.com

---

**From:** Hoan Le <hoan.le@itmsinc.com>
**Sent:** Thursday, September 19, 2024 8:43 AM
**To:** Talcott, Jonathon A. <TalcottJ@ballardspahr.com>
**Subject:** Requesting to extend subpoena - case # 0:23-cv-02016-KMM-JFD
**Importance:** High

⚠ **EXTERNAL**

Dear Jonathon,

I am writing to formally request an extension for complying with the subpoena issued on September 9th, 2024, referenced as case # 0:23-cv-02016-KMM-JFD. Due to the volume and complexity of information & documents requested in this subpoena, additional time is necessary to ensure that we can review and provide all the required materials in an accurate and comprehensive manner.

I am committed to fully complying with the subpoena and will make every effort to gather and submit the requested information by October 11th, 2024. I kindly request that you consider granting this extension and would greatly appreciate your prompt response.

Please feel free to contact me at 703-625-1535 or Hoan.le@itmsinc.com if you have any questions or need further clarification. I look forward to your understanding and a favorable response to this request.

Thank you for your attention to this matter.

Sincerely,
Hoan Le
President
Information Technology Management Services, Inc

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of ITMS, Inc. may contain information that is confidential and legally privileged. Please do not read, copy, forward, or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it to the sender and delete it completely from your computer system.

EXHIBIT
7

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

PLUS ONE, LLC,

                Plaintiff,

v.

CAPITAL RELOCATION SERVICES
L.L.C.,

                Defendant.

Case No. 23-cv-2016 (KMM/JFD)

**AMENDED PRETRIAL**
**SCHEDULING**
**ORDER**

Pursuant to Rule 16 of the Federal Rules of Civil Procedure and the Local Rules of this Court, and in order to secure the just, speedy, and inexpensive determination of this action, the following schedule shall govern these proceedings. This order may be modified only upon a showing of good cause as required by Federal Rule of Civil Procedure 16(b)(4) and Local Rule 16.3.

**FACT DISCOVERY: DEADLINES AND LIMITATIONS**

1.    The parties served initial disclosures under Fed. R. Civ. P. 26(a)(1) on **November 16, 2023**. The deadline for substantial completion of document discovery was **June 26, 2024.**

2.    Fact discovery shall be commenced in time to be completed on or before **December 20, 2024**.

3.    No more than a total of **25 interrogatories**, counted in accordance with Rule 33(a), shall be served by each side. No more than **50 document requests** and no more than **25 requests for admissions** shall be served by each side.

4.    No more than **10** fact depositions shall be taken per side without leave of court. This total does not include expert depositions but does include depositions of organizational-designee depositions taken pursuant to Fed. R. Civ. P. 30(b)(6).

An organizational-designee deposition shall count as 1 deposition, irrespective of the number of witnesses designated.

5.     No Rule 35 medical examinations shall be taken.

6.     Discovery of Electronically Stored Information.

    The parties have discussed issues about preservation and disclosure or discovery of electronically stored information as required by Fed. R. Civ. P. 26(f), including the form or forms in which it should be produced. The parties were to have informed the Court of any issues that arose related to electronic discovery by **February 1, 2024**.

7.     If the parties use the form protective order on the Court's website as a template for their own protective order, they should submit both the agreed-on protective order and a redline showing deviations from the Court's form order. (If the only change to the Court's form order is a change of caption and the insertion of the case name and file number as appropriate in the body of the protective order, then no redline need be submitted.)

## EXPERT DISCOVERY: DEADLINES AND LIMITATIONS

1.     Each side may call up to **3** initial expert witnesses. Disclosure of the identity of expert witnesses under Rule 26(a)(2)(A) and the full disclosures required by Rule 26(a)(2)(B), accompanied by the written report prepared and signed by the expert witness, shall be made as follows:

    a.   Initial experts.

        i.   The identity of any witness a party may use at trial to present evidence pursuant to Federal Rule of Evidence 702, 703, or 705 must be disclosed on or before **January 24, 2024**.

        ii.   The initial expert written report completed in accordance with Fed. R. Civ. P. 26(a)(2)(B) must be served on or before **January 24, 2024**.

    b.   Rebuttal experts.

        i.   The identity of any witness who may testify solely to contradict or rebut evidence on the same subject matter identified by another party under Federal Rule of Civil Procedure 26(a)(2)(B) or (C) must be disclosed on or before **March 7, 2024**.

        ii.   Any rebuttal expert's written report completed in accordance with Fed. R. Civ. P. 26(a)(2)(B) must be served on or before **March 7, 2024**.

2

2.    Each side may take one deposition per expert. Expert discovery, including depositions, shall be completed by **May 14, 2025**.

## DEADLINES FOR FILING MOTIONS

1.    All motions which seek to amend the pleadings or to add parties were to have been filed and served on or before **March 8, 2024**.

**2.**    Non-dispositive motions and supporting documents which relate to fact discovery or related matters shall be filed and served on or before **December 20, 2024.**

3.    Non-dispositive motions and supporting documents which relate to expert discovery shall be filed and served on or before **May 14, 2025**.

## NON-DISPOSITIVE MOTIONS: GUIDELINES

When possible, the parties should bring discovery disputes to the Court using the Court's process for informal dispute resolution (IDR). One or both parties can contact the Court via phone or email to set a prompt (usually within 2-3 business days) telephone conference to discuss the issues. Two days before the hearing, the parties shall email (not file) the Court either a joint letter setting forth their respective positions or separate letters. If the parties submit separate letters, they must serve a copy on the opposing side unless they have received prior permission from the Court to submit the letters ex parte. Letters should be concise and focus on narrowing the issue in dispute as much as possible. Both sides must agree to use the informal process to resolve discovery disputes. If either side objects to using this process, a formal motion must be filed.

If formal non-dispositive motions are filed, they must comply with the Electronic Case Filing Procedures for the District of Minnesota, with Local Rules 7.1 and 37.1, and be in the form prescribed by Local Rule 37.2. **Judge Docherty prefers not to receive**

courtesy copies, unless the motions contain or refer to documents that are not filed on ECF, in which case those documents should be emailed to **Docherty_chambers@mnd.uscourts.gov.** All non-dispositive motions shall be scheduled for hearing by calling the Judicial Assistant to Magistrate Judge Docherty, at 651-848-1180, prior to filing, except when all parties are in agreement that no hearing is required. Such an agreement shall be expressly set forth in the notice of motion. Counsel are advised not to notice additional motions for hearing on an already existing hearing date without first contacting the Court for permission to do so.

A "meet and confer" requirement applies to IDR and formal motion practice. Parties must attempt to confer through personal contact (during the COVID pandemic, "personal contact" means by telephone), rather than solely through written correspondence or email. Whether parties raise non-dispositive disputes informally or through traditional motions, the parties must engage in a focused meet and confer process in a sincere effort to resolve or narrow the disagreement.

## DISPOSITIVE MOTIONS: GUIDELINES AND DEADLINES

All dispositive motions must be served and filed on or before **July 14, 2025**. However, summary judgment motions may not be filed before the close of fact and expert discovery without seeking permission from the Court. If a party wants to file an early summary judgment motion, they must file a letter on the docket seeking leave to do so.

Dispositive motions must comply with Local Rule 7.1 and the Electronic Case Filing Procedures for the District of Minnesota. Counsel must schedule a hearing on

dispositive motions prior to filing by emailing Judge Menendez's chambers at menendez_chambers@mnd.uscourts.gov. **Courtesy copies are not requested or accepted by Judge Menendez.**

## <u>TRIAL</u>

If no summary judgment motions are filed, the case must be ready for a **jury** trial by no later than **September 15, 2025**.  If summary judgment motions are filed, unless otherwise ordered by Judge Menendez, the case must be ready for trial two months after the issuance of an Order on any summary judgment motions. The anticipated length of trial is **seven days**.

Date: October 31, 2024

*s/ John F. Docherty*
JOHN F. DOCHERTY
United States Magistrate Judge